1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

11
12
13
14
15
16
17

ADONAI EL-SHADDAI, aka
JAMES R. WILKERSON,

                          Plaintiff,

          v.

M. D. STAINER, et al.,

                          Defendants.

Case No. CV 14-9313 GHK(JC)

(~~PROPOSED~~)

ORDER DISMISSING SECOND
AMENDED COMPLAINT WITHOUT
LEAVE TO AMEND

## I.    BACKGROUND AND SUMMARY

On December 3, 2014, plaintiff Adonai El-Shaddai, also known as James R.
Wilkerson ("plaintiff") – who is a prisoner at the California State Prison, Los
Angeles County ("CSP-LAC"), is proceeding *pro se*, and has been granted leave to
proceed *in forma pauperis* – filed a Complaint ("Original Complaint") pursuant to
42 U.S.C. § 1983 ("Section 1983") and the Religious Land Use and
Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. §§ 2000cc *et seq.*,
against the following officials connected with the CSP-LAC:  (1) California
Department of Corrections and Rehabilitation ("CDCR") Secretary M.S. Stainer
("Stainer"); (2) CSP-LAC Warden J. Soto ("Soto"); and (3) CSP-LAC Jewish
Chaplain, J. Lazar ("Lazar").

On February 5, 2016, the assigned United States Magistrate Judge ("Magistrate Judge") screened and dismissed the Original Complaint and granted plaintiff leave to file a First Amended Complaint ("February Order").[1]  (Docket No. 50).  On March 23, 2016, this Court overruled plaintiff's objections to the February Order, and adopted and affirmed the February Order in full.  (Docket No. 54).

On April 1, 2016, plaintiff filed a First Amended Complaint ("FAC") against defendants Stainer, Soto, and Lazar, and two additional defendants, namely CSP-LAC Correctional Officer F. Garcia ("Garcia"), and High Desert State Prison ("HDSP") Warden D. L. Runnels ("Runnels").

On April 12, 2016, the Magistrate Judge screened and dismissed the First Amended Complaint and granted plaintiff leave to file a Second Amended Complaint ("April Order").[2]  (Docket No. 58).  On May 25, 2016, this Court overruled plaintiff's objections to the April Order, and adopted and affirmed the April Order in full ("May Order").  (Docket No. 62).

On June 27, 2016, plaintiff filed a Notice of Appeal.  (Docket No. 63).  On July 21, 2016, the Ninth Circuit dismissed plaintiff's interlocutory appeal for lack of appellate jurisdiction.  (Docket No. 64).

On August 29, 2016, plaintiff filed the operative Second Amended

---

[1]As explained in detail in the February Order, the Original Complaint was deficient because, among other things:  (1) it violated Rule 10 of the Federal Rules of Civil Procedure ("Rule 10"); (2) plaintiff's claims predicated on the alleged denial of a religious name change in 2005 were time-barred; (3) plaintiff's official capacity claims for damages against the defendant state officials were barred by the Eleventh Amendment; and (4) the Original Complaint failed to state a viable individual capacity claim under Section 1983 against any defendant.

[2] As explained in detail in the April Order, the First Amended Complaint, much like its predecessor, was deficient in multiple respects including, among other things:  (1) it violated Rule 10; (2) plaintiff's claims predicated on the alleged denial of a religious name change in 2005 were time-barred; (3) plaintiff's official capacity claims for damages against the defendant state officials were barred by the Eleventh Amendment; and (4) the First Amended Complaint failed to state a viable individual capacity Section 1983 claim against any defendant.

Complaint against defendants Stainer, Soto, Lazar, Garcia, and Runnels, and three additional CSP-LAC officials, namely Appeals Coordinator B. Harris ("Harris"), and correctional officers Romero ("Romero") and Drayton ("Drayton") (collectively "defendants").[3]  (SAC Form at 1, 3-4).  Plaintiff sues all defendants in their individual capacities only, and seeks monetary, declaratory, and injunctive relief.  (SAC Form at 3-4; SAC Att. ¶¶ 3-7).

Based upon the record and the applicable law, and as further discussed below, the Court now dismisses the Second Amended Complaint without further leave to amend and directs that judgment be entered accordingly, because plaintiff, having had three opportunities to plead his case, has been unable to state a viable claim based on essentially the same facts, and it appears that any further amendment would be futile.[4]

## II.    THE SECOND AMENDED COMPLAINT[5]

Liberally construed, the Second Amended Complaint alleges the following:

"Plaintiff is a student and metaphysical practitioner of the Holy Kabbalah the Hermetic Science or Occult Knowledge, the Pure and Holy Magick [sic] of Light, the Secrets of Mystic attainment of the Secret Wisdom of the Ancients, after the Messianic – Hermetic Order of Melchizedek."  (SAC Att. ¶ 8).

### A.    Religious Diet Request

---

[3]The Second Amended Complaint consists of a six-page form ("SAC Form") and an attached 13-page "Second Amended Complaint" ("SAC Att.") (collectively "Second Amended Complaint" or "SAC").  The Second Amended Complaint references multiple exhibits that are not attached thereto, but are attached to the First Amended Complaint ("Exhibits" or "Ex.").  Since internal page numbering for the Exhibits is inconsistent, the Court cites to the pages of the Exhibits as they are enumerated on the electronic version of the First Amended Complaint which appears on the docket (CM/ECF) as Docket No. 55.

[4]In light of this ruling, the pending Motion to Dismiss filed by defendant Stainer, Soto and Lazar (Docket No. 70) is moot and is denied as such without prejudice.

[5]Plaintiff's non-conclusory factual allegations are presumed to be true.

3

On April 15, 2012, plaintiff submitted to defendant Lazar a CDCR Form 3030 Religious Diet Request ("Religious Diet Request") which essentially requested that plaintiff be provided with the "Jewish Kosher" religious meal option. (SAC Att. ¶ 9; Ex. A at 19-22). In support of his Religious Diet Request, plaintiff submitted, in part, a September 24, 2012 letter from Rabbi Richard Aharon Chaimberlin of the Petah Tikvah Congregation ("Rabbi Chaimberlin's Letter"). (SAC Att. ¶ 9; Ex. A at 21). When asked in the Religious Diet Request form to state "the religious dietary laws to which [plaintiff] must adhere, and the tenets of [his] religion," plaintiff answered only "See Leviticus Chapter 11." (Ex. A at 19). The Religious Diet Request form also asked "Can your religious dietary needs be met by not eating pork, and/or following a vegetarian diet? If not, please explain why." (Ex. A at 19). Plaintiff answered "They are traf, they are not shochet, is not considered glatt, has to be Kashered. Fleishing and milchig can not be earten [sic] in the same meal, and must be pareve." (Ex. A at 19).

On April 25, 2012, defendant Lazar denied plaintiff's Religious Diet Request, stating that "[t]he Jewish kosher diet is for Jewish inmates only," and that plaintiff could instead apply for the vegetarian or Religious Meat Alternative diet. (SAC Att. ¶ 9; Ex. A at 19, 25-27).

On May 9, 2012, plaintiff filed a CDCR 602 Inmate Appeal (attached to which were, among other things, copies of the Religious Diet Request and Rabbi Chaimberlin's Letter), which was logged as Appeal # LAC-B-12-01824 ("Appeal # LAC-B-12-01824"). (SAC Att. ¶ 10; Ex. A at 17-22). In the CDCR 602 form for Appeal # LAC-B-12-01824, plaintiff explained the "issue" as follows:

> On 4/25/12 Chaplain Lazar denied my request for Kosher Diet alleging that the "Jewish Kosher Diet is for Jewish inmates." . . . Under [RLUIPA], "No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, even if the burden results from a rule of general

1    applicability, unless the government demonstrates that imposition of
2    the burden (1) is in furtherance of a compelling government interest,
3    and (2) is the least restrictive means for furthering that compelling
4    government interest.["] 42 U.S.C. § 2000cc-1.  Chaplain Lazar has not
5    put forth a compelling government interest in denying me a Kosher
6    Diet.

7  (Ex. A at 17-18).  Appeal # LAC-B-12-01824 was denied at the first level of
8  administrative review because plaintiff "[had] not provided sufficient information
9  to substantiate [his] affirmation to the Jewish faith."  (SAC Att. ¶ 11; Ex. A at 23-
10 24).  Plaintiff's appeal was denied at the second level of administrative review
11 "because [plaintiff] failed to establish he had historically practiced Judaism."
12 (SAC Att. ¶ 11; Ex. A at 25-26).  Plaintiff was also denied relief at the third, and
13 final, level of administrative review.  (SAC Att. ¶ 11; Ex. A at 27-28).

14       **B.     Requests for Religious Services**

15       On January 31, 2013, plaintiff submitted a CSP-LAC "Request for Religious
16 Accommodation" form ("First Request for Religious Services") in which plaintiff
17 allegedly requested "to have Messianic Hebrew Services according to the tradition
18 of the Holy Seed for the purpose of promoting, encouraging, developing, and
19 organizing Kabbalist studies and meditation class."  (SAC Att.
20 ¶ 12; Ex. B at 32-33).  In the First Request for Religious Services, plaintiff stated
21 that "[t]he aim of the Messianic Hebrew Services is to teach the Hermetic Science
22 or Occult Knowledge, the Pure and Holy Magick [sic] of Light, the Secrets of
23 Mystic attainment of the Secret Wisdom of the Ancients after the Hermetic Order
24 of Melchizedek."  (SAC Att. ¶ 12; Ex. B at 32).  Plaintiff requested that he be
25 permitted to hold "Messianic Hebrew Services" on Fridays from 3:30 p.m. to 5:30
26 p.m., and explained "[s]uch a program can benefit the institution by creating a
27 ///

28

harmonized environment and offer inmates the opportunity of rehabilitation and hope."  (Ex. B at 32).

On July 17, 2013, plaintiff filed a CDCR 602 Inmate Appeal (in part, with a copy of the First Request for Religious Services attached), which was logged as Appeal # LAC-B-13-02501 ("Appeal # LAC-B-13-02501") and complained, in pertinent part, that plaintiff had not received a response to the First Request for Religious Services for more than 60 days.  (SAC Att. ¶ 13; Ex. B at 30-33).  On July 22, 2013, defendant Harris returned Appeal # LAC-B-13-02501 to plaintiff after screening at the first level of review, and gave the following reasons:

**YOU HAVE FAILED TO ATTEMPT TO RESOLVE YOUR ISSUE AT THE LOWEST LEVEL BY USING THE FORM 22 PROCESS.  YOU MUST FIRST SUBMIT THE FORM 22 TO CHAPLAIN OMEIRA FOR A RESPONSE IN SECTION B.  IF YOU ARE DISSATISFIED WITH THEIR [sic] RESPONSE IN SECTION B, YOU MUST THEN FILL OUT SECTION C AND SUBMIT YOUR FORM 22 TO CRM J. HUNTER, FOR A RESPONSE IN SECTION D.  IF YOU ARE STILL NOT SATISFIED WITH THE RESPONSES ON THE FORM 22, ATTACH IT TO YOUR APPEAL AND RESUBMIT IT TO THE APPEALS OFFICE FOR FURTHER REVIEW.**

(SAC Att. ¶ 13; Ex. B at 38) (emphasis in original).

Thereafter, plaintiff submitted a CDCR Form 22 to Chaplain Omeira (which was forwarded to defendant Lazar).  On August 15, 2013 defendant Lazar informed plaintiff that the Religious Review Committee ("RRC") had denied plaintiff's First Request for Religious Services, and stated "you are welcome to avail yourself of the diverse choice of opportunities for study & worship offered on your yard."  (SAC Att. ¶ 11; Ex. B at 30-41).

///

6

On December 6, 2013 – after plaintiff apparently made several failed attempts to appeal the denial of his First Request for Religious Services – defendant Harris returned Appeal # LAC-B-13-02501 to plaintiff after re-screening at the first level of review, stating:

> ***It has been determined that you are attempting to submit an appeal that has been previously cancelled.  Pursuant to CCR 3084.4 you are advised that this is considered misuse or abuse of the appeals process.  Repeated violations may lead to your being placed on appeal restriction as described in CCR 3084.4(g).*  [¶] Do not resubmit unless you follow my instructions.  Failure to do so will result in cancellation of this appeal.**

(Ex. B at 41) (emphasis in original).  Plaintiff alleges that "[he] acted with due diligent [sic] and Defendant Harris refused to process [plaintiff's] appeal in violation of the Fifth and Fo[ur]teenth Amendments to the Const[it]ution][,] and in violation of the First Amendment of the Constitution of 'Free Exercise' of religion."  (SAC Att. ¶ 14).

On February 3, 2014, plaintiff submitted a second CSP-LAC Request for Religious Accommodation ("Second Request for Religious Services") in which plaintiff requested to hold "Kabbalat Shabbat F[ri]day services from [3:30 p.m. to 5:30 p.m.]" for "Messianic Studies and Meditation classes."  (SAC Att. ¶ 15; Ex. C at 46-47).  In the Second Request for Religious Services, plaintiff identified himself as "His Royal Highness, Adonai Zedek Melek El-Shaddai, High Priest of the Hermetic Order of Melchizedek," and explained that his "Priesthood" was "established according to the Tradition of the Holy Seed for the purpose of promoting, encouraging, developing, and organizing Messianic Studies and Meditation Classes ."  (Ex. C at 46-47).  The Second Request for Religious Services also asserted that "[t]he aim of the Messianic Studies and Meditation Classes is to teach the Hermetic Science or Occult Knowledge, the Pure and Holy

Magick [sic] of Light, the Secrets of Mystic attainment of the Secret Wisdom of the Ancients, after the Hermetic Order of Melchizedek." (Ex. C at 46-47).

### C.   Request for Ritual Herbal Smoke/Smoking Blends

On August 17, 2013, plaintiff submitted a letter to the CSP-LAC Community Partnership Manager, John Hunter (not a defendant), requesting approval to order several "Ritual Herbal Smoking Blends" ("August 17, 2013 Letter"). (SAC Att. ¶ 16; Ex. D at 58). In his request, plaintiff stated that Ritual Herbal Smoking Blends were "essential to [his] religious practice" for the following reasons:

> These Ritual Herbal Smoking Blends are non-tobacco utilized in ceremoniously [sic] as an aphrodisia [sic] sacrament with mystical observance somatic consciousness, sensitivities and magickal [sic] enchantment when engaged in magickal [sic] rites. As a metaphysical practitioner Ritual Herbal Smoke Blends are used as a way to encourage intuition, clairvoyance or psychic attention. These herbal aid for vision quest [sic]. Holistically, are utilized for purifying affects [sic], reduce coughing, repair lung tissue, aid in weight control and to lower blood pressure.

(SAC Att. ¶ 16; Ex. D at 58). Plaintiff also alleges that such items "relieve chronic back pain." (SAC Att. ¶ 16).

On August 21, 2013, plaintiff submitted a CDCR 602 Inmate Appeal (with a copy of the August 17, 2013 Letter attached), which was logged as Appeal # LAC-B-13-02958 ("Appeal # LAC-B-13-02958"), and which complained that Mr. Hunter had "disapproved" plaintiff's request for Ritual Herbal Smoking Blends, and again requested approval for Ritual Herbal Smoking Blends. (Ex. D at 52-54).

On September 12, 2013, the RRC denied plaintiff's "request[] to purchase 'Ritual Herbal Smoking Blends' used in the Kabala faith[,]" stating:

///

8

The Personal Religious Property matrix specifies what type and what quantity of herbs may be obtained.  [Plaintiff] has stated that the herbs are used as (direct quote) "Aphrodisiac sacrament".  The RRC looked at the Merriam-Webster dictionary to gain a better definition of aphrodisiac:  "Something that causes or increases sexual desire".  Based on this information, the request to smoke, the disruption that smoking will cause on the facility[,] and the danger of having an increased sexual drive in an all male environment requires the RRC to deny this request.

(SAC Att. ¶ 17; Ex. D at 59).

On October 9, 2013, Appeal # LAC-B-13-02958 was partially granted to the extent plaintiff wished to order herbs of the type and quantity specified in the religious personal property matrix.  (Ex. D at 55-57).  The "First Level Responce [sic]" memorandum explained, in pertinent part that "[t]he religious personal property matrix (attached) specifies which herbs and the quantity of each you may possess.  If you order according to this matrix you are within State guidelines, this is **granted**."  (Ex. D at 56) (emphasis in original).

On October 10, 2013, plaintiff "submitted his dissatisfaction with the First Level response" to Appeal # LAC-B-13-02958, in which plaintiff stated:

[F]or clarification [plaintiff's] request for Ritual Herbal Smoke Blends was not for the purpose of aphrodisiac sacrament, but to encourage intuition, clairvoyance or psychic attention, and to aid in vision quest.  Holistically, for purifying affects [sic], reducing coughing, repairing lung tissues, aiding weight control, lowering blood pressure, and chronic pain management.  Also, most Ritual Herbal Smoke Blends are not for aphrodisiac sacrament.  The Hemp plant is a Ritual Herbal Smoke Blend that is not used for

///

aphrodisiactic [sic] sacrament, as such Plaintiff should be approved for its use.

(SAC Att. ¶ 18).

On December 30, 2013, CSP-LAC Chief Deputy Warden T. Miguel (not a defendant) partially granted Appeal # LAC-B-13-02958, again to the extent plaintiff wished to order herbs of the type and quantity specified in the "Religious Personal Property Matrix" ("RPPM") effective December 10, 2013.  (SAC Att. ¶ 18; Ex. D at 49-51).  More specifically, in the "Second Level Responce [sic]" memorandum, Chief Deputy Warden Miguel explained, in pertinent part:

> The religious personal property matrix [] effective December 10, 2013, specifies which herbs and the quantity of each you may possess.  If you order according to this matrix you are within state guidelines, this portion of the appeal is **granted**.  [¶] [¶]
>
> At the second level review, you state Mr. Hunter failed to put forth a legitimate penological interest for denying your request for the Ritual Herbal Smoking Blends[.]  However Mr. Hunter rightly stated if the items you are requesting are listed on the current religious property matrix you may order them as long as you follow the matrix guidelines.  This portion of your appeal request is **granted**.

(Ex. D at 50, 51) (emphasis in original).  In addition, Chief Deputy Warden Miguel partially denied Appeal # LAC-B-13-02958 for the following reasons:

> Your request to have ritual smoking herbs that are used as an aphrodisiac is **denied** on the grounds that a person (you) with a heightened or increased sexual desire mixed with a euphoric or excited sense, poses a security risk as the person feeling these effects may not have the ability to control the sexual urge, leading to the victimization of others. . . . [¶]

///

10

1               Your statements that herbs can be used holistically for

2               purifying, reducing coughing, repair [sic] lung tissue and lower [sic]

3               blood pressure, would need a medical clinician to evaluate as these are

4               medical issues not religious issues. . . .

5  (Ex. D at 50-51) (emphasis in original).

6       "On July 31, 2014, Defendant Garcia refused to issue plaintiff his Ritual

7  Herbal Smoke Blends specifically expressing his disapproval of Plaintiff's

8  approved religious right to receive Ritual Herbal Smoke Blends, stating [he] would

9  never issue Plaintiff his approved Ritual Herbal Smoke Blends, a denial of a

10  protected religious practice under the First Amendment of the Constitution of 'Free

11  Exercise' of religion, and under RULIPA [sic]."  (SAC Att. ¶ 19) (alteration in

12  original).

13       On August 22, 2014, plaintiff submitted a CDCR 602 Inmate Appeal, which

14  was logged as Appeal # LAC-D-14-02830 ("Appeal # LAC-D-14-02830"), and in

15  which plaintiff essentially complained that defendant Garcia had improperly

16  refused to issue plaintiff's "Ritual Herbal Smoke Blends" which had already been

17  approved by the RRC and Warden Advisory Group ("WAG").  (SAC Att. ¶ 20; Ex.

18  E at 80-81).  Plaintiff also asserted that "[o]n December 30, 2013, T. Miguel, Chief

19  Deputy Warden, granted [plaintiff's] request for Ritual Herbal Smoke Blends *not*

20  listed on RPPM, this matter is stare decisis." (Ex. E at 81) (emphasis added).

21       Appeal # LAC-D-14-02830 was denied at the First Level of review.  (Ex. E

22  at 89-90).  A first level response memorandum dated November 18, 2014, framed

23  the "issue" in Appeal # LAC-D-14-02830, in part, as follows:

24               In your appeal you stated that on July 31, 2014, [defendant

25               Garcia] . . . refused to issue you your Ritual Herbal Smoke Blends . . .

26               which were requested pursuant to Appeal [#] LAC-B-13-02958

27               approved by the Religious Review Committee (RRC) and Wardens

28               Advisory Group (WAG), [and] therefore should be issued to you

1    according to established procedures.

2    (Ex. E at 89).  The first level response also described an interview which had been

3    conducted in connection with Appeal # LAC-D-14-02830:

4    On Tuesday, November 4, 2014, at approximately [1:45 p.m.],

5    Muslim Chaplain  . . . Omeira interviewed you in person to provide

6    you the opportunity to fully explain your appeal and for you to

7    provide any supporting information or documentation. . . . [¶]  [Y]ou

8    gave [Chaplain Omeira] [Appeal #] LAC-B-13-02958 as an additional

9    attachment to support your argument.  Furthermore Chaplain Omeira

10    asked you to show him where in the [A]ppeal [#] LAC-B-13-02958

11    you were granted the right to buy herbs other than what had been

12    approved in the RPPM.  You stated that the statement that says ["]if

13    you order according to this Matrix you are within State guidelines,

14    this portion of your appeal is **granted**["] is specifying the amount but

15    not what kind of herb you can order.  Chaplain Omeira read the

16    Paragraph twice and explained that RPPM specifies the kind and the

17    weight of the herbs approved. . . .  In addition Chaplain Omeira

18    explained that there are no established procedures that will give

19    inmates herb [sic] that will make them high and jeopardize the safety

20    and security of the Institution.

21    (Ex. E at 89-90).

22    On February 2, 2015, Chief Deputy Warden Biaggini (not a defendant)

23    denied Appeal # LAC-D-14-2830 at the second level of review, stating, in

24    pertinent part, "the Ritual Herbal Smoke Blends will not be issued to you as they

25    are not approved by the RRC and WAG."  (Ex. E at 87-88).  Chief Deputy Warden

26    Biaggini explained:

27    ///

28    There are currently no provisions . . . that would permit the

1    issuance of Ritual Herbal Smoke Blends.  The appeal which initially

2    granted you permission to order herbs per the RPPM was in error.

3    The RRC and WAG have not authorized the Ritual Herbal Smoking

4    blend as part of the RPPM and therefore R&R staff and Facility staff

5    are following Departmental Policy in not issuing the smoking blends

6    to you.

7  (Ex. E at 87).

8        On August 17, 2015, Appeal # LAC-D-14-2830 was cancelled at the third

9  level of review, purportedly because it was a "duplicate[]" of Appeal # LAC-B-13-

10  02958 upon which a decision had already been rendered.  (SAC Att. ¶ 20; Ex. E at

11  79).

12        **D.**    **Requests for Religious Name Change**

13        Plaintiff alleges that he "has a Common Law right under God (Isaiah 65:15,

14  Jeremiah 23:6, Isaiah 9:6, Isaiah 62:2, Acts 9:15-16, and Psalms 118:26) to a legal

15  name change to Adonai Zedek Melek El-Shaddai as a tenet mandated by his

16  religious belief, a protected religious practice under the First Amendment to the

17  Constitution of 'Free Exercise' of religion, and under RULIPA [sic]."  (SAC Att.

18  ¶ 21).

19        **1.**    **First Religious Name Change Request**

20        On January 13, 2005, plaintiff submitted a CDCR 602 Inmate Appeal which

21  was logged as Appeal No. HDSP-05-397 ("Appeal # HDSP-05-397") and in which

22  plaintiff "request[ed] a legal name change as a tenet mandated by his religious

23  belief," and complained, in pertinent part, that prison officials had refused to

24  deliver plaintiff's legal and personal mail whenever it was addressed to plaintiff "in

25  his Sacred name" ("First Religious Name Change Request") and that the mail was

26  "return[ed] to the sender stamped 'Inmate Name and CDC# Do Not Match'

27  without notice to plaintiff in violation of the Fifth and Fourteenth Amendments to

28  the Constitution, and under the First Amendment to the Constitution to 'Access to

1   Court', to 'Freedom of Expression', to 'Freedom Association' [sic], to 'Free

2   Exercise of Religion', and in violation of RULIPA [sic]."  (SAC Att. ¶ 22).

3         Defendant Runnels, HDSP warden, denied plaintiff's First Religious Name

4   Change Request, "stating that 'the people of the State of California is [sic] not

5   obligated to incur the expense of adjustments of records and computerized

6   databases at the institution, the CDC and the Department of Justice', creating a

7   policy and custom under which unconstitutional practices occur and has allowed

8   the continuance of such a policy and custom that continue [sic] today."  (SAC Att.

9   ¶ 24).  Defendant Runnels "knew or should have known he could fully

10  accommodate Plaintiff [sic] request for a legal name change as a tenet mandated by

11  his religious practice at a de minus [sic] cost . . . pursuant to CDCR Operations

12  Manual Section 73010.5" which provides that identifying data on CDC Form 188

13  "shall include . . . 'Records of inmates who subsequently received a court ordered

14  legal name change shall continue to use the commitment name.  The new legal

15  name shall be recorded as an Also Committed As (ACA), and may be use [sic] by

16  the inmate for mail and visiting purposes.'"  (SAC Att. ¶ 24).  Plaintiff was also

17  informed "that he may utilize his religious name along with his commitment name

18  and his CDC identification number of incoming, outgoing and confidential

19  correspondence."  (SAC Att. ¶ 24; Ex. F at 98).

20        A CDCR Inmate Appeals Branch "Director's Level Appeal Decision" dated

21  September 12, 2005 ("September 2005 Director's Decision") addressing plaintiff's

22  First Religious Name Change Request, and referencing "Wilkerson, C-08082 [¶]

23  High Desert State Prison," "IAB Case No.: 0412371," and "[Appeal #] HDSP-05-

24  397," appears to indicate, in pertinent part, that (1) plaintiff had originally

25  requested that his name be changed in his CDCR central file, which was required

26  by "his religious faith"; (2) "[t]he warden" elected "to deny [plaintiff's] request for

27  a name change"; (3) at the "Second Level[]" of inmate appeal, the "reviewer found

28  that [plaintiff] ha[d] not properly changed his name," and plaintiff "was informed

14

that he may utilize his religious name along with his commitment name and his
[CDCR] identification number for incoming, outgoing and confidential
correspondence[]"; and (4) the Chief of the CDCR Inmate Appeals Branch
declined to modify the decision to deny plaintiff's First Religious Name Change
Request.  (Ex. F at 98).

### 2.    Second Religious Name Change Request

On January 6, 2015, plaintiff submitted a CDCR 602 Inmate Appeal which
complained that on January 2, 2015, plaintiff had received certain "legal mail"
from Corrections Officer Lage (not a defendant) that contained documents which
reflected that mail from this Court which had been addressed to plaintiff in his
"chosen religious name" only (*i.e.*, "Adonai El-Shaddai") was returned to the Court
as undeliverable with a note on the envelope that the "inmate name and CDC#
[did] not match."  (SAC Att. ¶ 25; Ex. G at 100-08).  In the appeal plaintiff
requested that he be permitted to use his "chosen religious name" and receive legal
mail addressed to him with such name ("Second Religious Name Change
Request").  (SAC Att. ¶ 26; Ex. G at 100).

On January 7, 2015 plaintiff's Second Religious Name Change Request was
canceled purportedly because it was a duplicate of a prior appeal on which a
decision had already been rendered.  (SAC Att. ¶ 26; Ex. G at 109).  Plaintiff
alleges this was "a created policy and custom under which unconstitutional []
practices ourr [sic] and has allowed the continuance of such a policy and custom in
violation of the First Amendment to the Constitution to 'Access to Court', to
'Freedom of Expression', to ' Freedom of Association', to 'Free Exercise of
Religion',  and in violation of RULIPA [sic], and  in violation of the Fifth
Amendment to the Constitution to 'Equal Protection of Law', and in violation of
the Fourteenth Amendment to the Constitution to 'Due Process of Law'."  (SAC
Att. ¶ 26).

### 3.    Third Religious Name Change Request

On October 29, 2015, plaintiff submitted a CDCR 602 Inmate Appeal which complained that on October 20, 2015, defendants Romero and Drayton ordered the removal and replacement of plaintiff's door sign which displayed plaintiff's religious name along with his commitment name, and that such actions violated the September 2005 Director's Decision "which approved Plaintiff's right to utilize[] his religious name along with his commitment name for incoming and outgoing mail[,]" and in which plaintiff requested, in part, that "pursuant to CDCR Operations Manual 73010.6.1 Identifying Data" plaintiff's "religious name Adonai El-Shaddai be added to [his] CDC Form 188" ("Third Religious Name Change Request").  (SAC Att. ¶ 27; Ex. H at 111-12).  Plaintiff alleges that "[t]o ensure the delivery of Plaintiff's incoming mail his religious name must be on his door sign."  (SAC Att. ¶ 27).  Plaintiff also complained in the Third Religious Name Change Request that when he attempted to show defendants Romero and Drayton the September 2005 Director's Decision the two defendants "went rogue," acted unprofessionally, and disregarded the director's level ruling "which approved plaintiff's right to utilized [sic] his religious name along with his commitment name for incoming and outgoing mail."  (SAC Att. ¶ 27; Ex. H at 112).

On November 5, 2015, the Third Religious Name Change Request was rejected on screening at the first level of review purportedly "[p]ursuant to the California Code of Regulations, Title 15, Section (CCR) 3084.6(b)(2)" because plaintiff "failed to demonstrate a material adverse effect upon [his] welfare."  (SAC Att. ¶ 27; Ex. H at 115).  The November 5 screening memo explained further:

**THE SECOND LEVEL DECISION IS STATING [sic] YOU CAN USE YOUR RELIGIOUS NAME ALONG WITH YOUR COMMITMENT NAME FOR INCOMING AND OUTGOING CORRESPONDENCE.  THE NAME PLACED ABOVE YOUR DOOR HAS NOTHING TO DO WITH INCOMING AND OUTGOIN[G] CORRESPONDENCE.**

**STATE WHAT THE ADVERSE EFFECT ON YOU IS?**
(Ex. H at 115) (emphasis in original).

On November 11, 2015, plaintiff wrote the following response to the November 5 screening memo:

> I am requesting that my Sacred name be placed on my CDCR 188 and my door tag.  Appeal Log No. 01412371 [(Appeal # HDSP 05-397)] is evidence that I am proved [sic] to use my Sacred name on all correspondence and officers are refusing to deliver my mail addressed to me in my Sacred name because it's not on my CDCR 188 or on the door tag.

(Ex. H at 115).

On November 21, 2015, the Third Religious Name Change Request was again rejected on screening at the first level of review purportedly "[p]ursuant to the California Code of Regulations, Title 15, Section (CCR) 3084.6(b)(16)" because "***the appeal issue or complaint emphasis has been changed at some point in the process to the extent that the issue is entirely new, and the required lower levels of review and assessment have thereby been circumvented***."  (Ex. H at 114) (emphasis in original).  The November 21 screening memo explained:

> **THE THIRD LEVEL APPEAL YOU REFER TO #0412371 MADE THE DECISION THAT YOUR ORIGINAL COMMITMENT NAME SHALL REMAIN ON ALL DEPARTMENTAL RECORDS AND SHALL CONTINUE TO BE USED ON ALL DEPARTMENTAL RECORDS. . . .  IT ALSO APPEARS YOU ARE ATTEMPTING TO CHANGE THE**

///
///

17

1    **APPEAL ISSUE BY STATING THE STAFF ARE NOT**

2    **DELIVERING YOUR MAIL NOW.**

3    (Ex. H at 114) (emphasis in original).

4    **E.    Claims**

5         Plaintiff alleges that the foregoing actions violated multiple First

6    Amendment rights (*i.e.*, free exercise of religion, freedom of expression and

7    association, access to courts, freedom from government establishment of religion),

8    as well as the Due Process and Equal Protection Clauses of the Fifth and

9    Fourteenth Amendments, RLUIPA, and plaintiff's "Common Law right under

10   God."  (SAC Att. ¶¶ 28-35).

11   **III.   LEGAL STANDARDS**

12        **A.    The Screening Requirement**

13        As plaintiff is a prisoner proceeding *in forma pauperis* on a civil rights

14   complaint against governmental defendants, the Court must screen the Second

15   Amended Complaint, and is required to dismiss the case at any time it concludes

16   the action is frivolous or malicious, fails to state a claim on which relief may be

17   granted, or seeks monetary relief against a defendant who is immune from such

18   relief.  <u>See</u> 28 U.S.C. §§ 1915(e)(2)(B), 1915A; 42 U.S.C. § 1997e(c).

19        In determining whether a complaint fails to state a viable claim for purposes

20   of screening, the Court applies the same pleading standard from Rule 8 of the

21   Federal Rules of Civil Procedure ("Rule 8") as it would when evaluating a motion

22   to dismiss under Federal Rule of Civil Procedure 12(b)(6).  <u>See</u> <u>Wilhelm v.</u>

23   <u>Rotman</u>, 680 F.3d 1113, 1121 (9th Cir. 2012) (citations omitted).  Under Rule 8, a

24   complaint must contain a "short and plain statement of the claim showing that the

25   pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  While Rule 8 does not require

26   detailed factual allegations, at a minimum a complaint must allege enough specific

27   facts to provide "fair notice" of *both* the particular claim being asserted *and* "the

28   grounds upon which [that claim] rests."  <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S.

1   544, 555 & n.3 (2007) (citation and quotation marks omitted); see also Ashcroft v.

2   Iqbal, 556 U.S. 662, 678 (2009) (Rule 8 pleading standard "demands more than an

3   unadorned, the-defendant-unlawfully-harmed-me accusation") (citing id. at 555).

4        Thus, to survive screening, a civil rights complaint must "contain sufficient

5   factual matter, accepted as true, to state a claim to relief that is plausible on its

6   face." Nordstrom v. Ryan, 762 F.3d 903, 908 (9th Cir. 2014) (citations and

7   quotation marks omitted).  A claim is "plausible" when the facts alleged in the

8   complaint would support a reasonable inference that the plaintiff is entitled to relief

9   from a specific defendant for specific misconduct.  Iqbal, 556 U.S. at 678 (citation

10  omitted); see also Gauvin v. Trombatore, 682 F. Supp. 1067, 1071 (N.D. Cal.

11  1988) (complaint "must allege the basis of [plaintiff's] claim against *each*

12  defendant" to satisfy Rule 8 pleading requirements) (emphasis added).  Allegations

13  that are "merely consistent with" a defendant's liability, or reflect only "the mere

14  possibility of misconduct" do not "*show[]* that the pleader is entitled to relief" (as

15  required by Fed. R. Civ. P. 8(a)(2)), and thus are insufficient to state a claim that is

16  "plausible on its face."  Iqbal, 556 U.S. at 678-79 (citations and quotation marks

17  omitted).  At the screening stage,"well-pleaded factual allegations" in a complaint

18  are assumed true, while "[t]hreadbare recitals of the elements of a cause of action"

19  and "legal conclusion[s] couched as a factual allegation" are not.  Id. (citation and

20  quotation marks omitted).  In addition, the Court is "not required to accept as true

21  conclusory allegations which are contradicted by documents referred to in the

22  complaint," Steckman v. Hart Brewing, Inc., 143 F.3d 1293, 1295-96 (9th Cir.

23  1998) (citation omitted), and "need not [] accept as true allegations that contradict

24  matters properly subject to judicial notice or by exhibit," Sprewell v. Golden State

25  Warriors, 266 F.3d 979, 988 (9th Cir.), amended on denial of reh'g, 275 F.3d 1187

26  (9th Cir. 2001) (citation omitted).

27        *Pro se* complaints in civil rights cases are interpreted liberally to give

28  plaintiffs "the benefit of any doubt."  Akhtar v. Mesa, 698 F.3d 1202, 1212 (9th

Cir. 2012) (citation and internal quotation marks omitted).  If a *pro se* complaint is dismissed for failure to state a claim, the court must "freely" grant leave to amend if it is "at all possible" that the plaintiff could correct the pleading errors in the complaint by alleging "other facts."  <u>Cafasso v. General Dynamics C4 Systems, Inc.</u>, 637 F.3d 1047, 1058 (9th Cir. 2011) (citation omitted); <u>Lopez v. Smith</u>, 203 F.3d 1122, 1126-30 (9th Cir. 2000) (en banc) (citation and quotation marks omitted).  Nonetheless, courts have the discretion to deny leave to amend where there is "undue prejudice to the opposing party, bad faith by the movant, futility, and undue delay."  <u>Cafasso</u>, 637 F.3d at 1058 (citations omitted).  Courts have "particularly broad" discretion where a plaintiff "has previously amended the complaint."  <u>Id.</u> (citation and quotation marks omitted).

## B.   Section 1983 Claims

To state a claim under Section 1983, a plaintiff must plausibly allege that a defendant, while acting under color of state law, caused a deprivation of the plaintiff's federal rights.  42 U.S.C. § 1983; <u>West v. Atkins</u>, 487 U.S. 42, 48 (1988) (citations omitted); <u>Taylor v. List</u>, 880 F.2d 1040, 1045 (9th Cir. 1989) (citation omitted).  There is no vicarious liability in Section 1983 lawsuits.  <u>Iqbal</u>, 556 U.S. at 676 (citing, *inter alia*, <u>Monell v. New York City Department of Social Services</u>, 436 U.S. 658, 691 (1978)).  Hence, a government official – whether subordinate or supervisor – may be held liable under Section 1983 only when his or her own actions have caused a constitutional deprivation.  <u>OSU Student Alliance v. Ray</u>, 699 F.3d 1053, 1069 (9th Cir. 2012) ("[E]ach government official, his or her title notwithstanding, is only liable for his or her own misconduct.") (quoting <u>id.</u>; internal quotation marks omitted), <u>cert. denied</u>, 134 S. Ct. 70 (2013); <u>see also</u> <u>Taylor</u>, 880 F.2d at 1045 ("Liability under section 1983

*///*

20

1  arises only upon a showing of personal participation by the defendant.") (citation

2  omitted).

3        An individual government defendant "causes" a constitutional deprivation

4  when he or she (1) "does an affirmative act, participates in another's affirmative

5  acts, or omits to perform an act which he [or she] is legally required to do that

6  causes the deprivation"; or (2) "set[s] in motion a series of acts by others which the

7  [defendant] knows or reasonably should know would cause others to inflict the

8  constitutional injury." Johnson v. Duffy, 588 F.2d 740, 743-44 (9th Cir. 1978)

9  (citations omitted); see also Lacey v. Maricopa County, 693 F.3d 896, 915 (9th Cir.

10 2012) (en banc) (same) (citing id.).  Allegations regarding causation "must be

11 individualized and focus on the duties and responsibilities of each individual

12 defendant whose acts or omissions are alleged to have caused a constitutional

13 deprivation."  Leer v. Murphy, 844 F.2d 628, 633 (9th Cir. 1988) (citations

14 omitted).

15       Similarly, a government official acting in a supervisory capacity may be held

16 individually liable under Section 1983 if the supervisor's own misconduct caused a

17 constitutional deprivation.  OSU Student Alliance, 699 F.3d at 1069 (citing Iqbal,

18 556 U.S. at 676); see also Starr v. Baca, 652 F.3d 1202, 1207 (9th Cir. 2011) ("We

19 have long permitted plaintiffs to hold supervisors individually liable in § 1983 suits

20 when culpable action, or inaction, is directly attributed to them."), cert. denied, 132

21 S. Ct. 2101 (2012).  More specifically, a supervisor "causes" a constitutional

22 deprivation if he (1) personally participates in or directs a subordinate's

23 constitutional violation; or (2) the constitutional deprivation can otherwise be

24 "directly attributed" to the supervisor's own culpable action or inaction, even

25 though the supervisor was not "physically present when the [plaintiff's] injury

26 occurred."  See Starr, 652 F.3d at 1206-07; see also Crowley v. Bannister, 734 F.3d

27 967, 977 (9th Cir. 2013) (supervisor may be held liable under Section 1983 only if

28 there is "a sufficient causal connection between the supervisor's wrongful conduct

1   and the constitutional violation") (citations and internal quotation marks omitted).

2   **C.     First Amendment Claims**

3          The First Amendment to the United States Constitution, which is applicable

4   to the states through the Fourteenth Amendment, provides:  "Congress shall make

5   no law respecting an establishment of religion, or prohibiting the free exercise

6   thereof; or abridging the freedom of speech, . . .; or the right of the people

7   peaceably to assemble, and to petition the Government for a redress of grievances."

8   U.S. Const. amend. I; see Everson v. Board of Education, 330 U.S. 1, 15 (1947).

9   Prisoners "clearly retain protections afforded by the First Amendment. . . ."

10  O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987) (citations omitted),

11  superseded by statute on other grounds, 42 U.S.C. §§ 2000cc, et seq.  As a

12  consequence of incarceration, however, a prisoner's First Amendment rights are

13  necessarily "more limited in scope than the constitutional rights held by individuals

14  in society at large."  Shaw v. Murphy, 532 U.S. 223, 229 (2001).  Thus, an inmate

15  retains only "those First Amendment rights that are not inconsistent with his status

16  as a prisoner or with the legitimate penological objectives of the corrections

17  system."  Pell v. Procunier, 417 U.S. 817, 822 (1974) ("[L]awful incarceration

18  brings about the necessary withdrawal or limitation of many privileges and rights,

19  a retraction justified by the considerations underlying our penal system.") (citations

20  and internal quotation marks omitted).

21          **1.     Establishment Clause**

22          The first of the two "Religion Clauses of the First Amendment" –

23  "commonly called the Establishment Clause" – generally requires "a separation of

24  church and state."  Cutter v. Wilkinson, 544 U.S. 709, 719 (2005).  The central

25  value of the Establishment Clause is "official religious neutrality. . . ."  McCreary

26  County, Kentucky v. American Civil Liberties Union of Kentucky, 545 U.S. 844,

27  860 (2005) (citations omitted).  Government officials generally may not "act[] with

28  the ostensible and predominant purpose of advancing religion. . . ."  Id. at 859

1  (citation omitted).  For example, the government "may not favor one religion over

2  another[,]" id. at 859, 875-76 (citations omitted), and "may not coerce anyone to

3  support or participate in religion or its exercise[,]" Inouye v. Kemna, 504 F.3d 705,

4  713 (9th Cir. 2007) (citing, in part, Lee v. Weisman, 505 U.S. 577, 587 (1992)).

5  Establishment Clause claims are basically evaluated under the so-called

6  "Lemon test."  Inouye, 504 F.3d at 713 n.7 ("basic test for Establishment Clause

7  violations remains that articulated in Lemon v. Kurtzman, 403 U.S. 602, 613 . . .

8  (1971)").  Under the Lemon test, governmental action of a potentially religious

9  nature does not violate the Establishment Clause if (1) it has a "secular [] purpose";

10  (2) its "principal or primary effect . . . neither advances nor inhibits religion"; and

11  (3) it does not foster "excessive government entanglement with religion." Id.

12  (citation omitted).

13  ### 2.    Free Exercise of Religion

14  The second religion clause – the Free Exercise Clause – "requires

15  government respect for, and noninterference with, [] religious beliefs and practices.

16  . . ." Cutter, 544 U.S. at 719.  To state a claim under the Free Exercise Clause, an

17  inmate must plausibly allege that a prison official's actions

18  (a) "substantially burden[ed]" the inmate's exercise of a sincerely-held religious

19  belief; and (b) did so in an unreasonable manner – i.e., the official's actions were

20  not "rationally related to legitimate penological interests."  See O'Lone, 482 U.S.

21  at 348-50; Jones v. Williams, 791 F.3d 1023, 1031, 1033 (9th Cir. 2015) (citation

22  omitted); Shakur v. Schriro, 514 F.3d 878, 884-85 (9th Cir. 2008) (citations

23  omitted).  "[G]overnment action places a substantial burden on an individual's

24  right to free exercise of religion when it tends to coerce the individual to forego

25  [his or] her sincerely held religious beliefs or to engage in conduct that violates

26  ///

27

28

1   those beliefs." <u>Jones v. Williams</u>, 791 F.3d at 1031-33 (a "substantial burden"

2   must be "more than an inconvenience on religious exercise") (citations omitted).

3   Only exercises "rooted in religious belief" are protected by the Free Exercise

4   Clause. <u>United States v. Ward</u>, 989 F.2d 1015, 1017 (9th Cir. 1992) (citation and

5   internal quotation marks omitted). Determination of what constitutes a "religious"

6   belief or practice protected by the First Amendment "is a notoriously difficult, if

7   not impossible, task." <u>Alvarado v. City of San Jose</u>, 94 F.3d 1223, 1227 (9th Cir.

8   1996) (as amended) (citations omitted). Beliefs may be religious, in part, if they

9   stem from a "fundamental" and "comprehensive" system of "moral, ethical, or

10  religious beliefs about what is right and wrong." <u>Ward</u>, 989 F.2d at 1020 & n.2

11  (citing, in part, <u>Welsh v. United States</u>, 398 U.S. 333, 338 (1970) and noting

12  "[c]ourts regularly use the *Welsh* test to determine whether belief is 'religious' for

13  First Amendment free exercise purposes." ); <u>Alvarado</u>, 94 F.3d at 1228-29

14  (defining religion, in part, as "belief-system as opposed to an isolated teaching"

15  which "addresses fundamental and ultimate questions having to do with deep and

16  imponderable matters[,] . . . is comprehensive in nature[,] . . . [and] often can be

17  recognized by the presence of certain formal and external signs"). The First

18  Amendment even protects religious practices that appear "peculiar[] or unique[]"

19  to others. <u>Id.</u> at 1018 n.1 (citations omitted). Nonetheless, the Free Exercise

20  Clause does not protect practices related to "purely secular philosophical

21  concern[s]. . . ." <u>Ward</u>, 989 F.2d at 1018 (citations and quotation marks omitted).

22  An individual's beliefs are considered sincere if they are "held with the strength of

23  traditional religious convictions." <u>Ward</u>, 989 F.2d at 1020.

24  To determine whether a prison official's actions were a reasonable – rather

25  than an "exaggerated" – response to a legitimate penological interest, courts

26  consider four factors, specifically "(1) Whether there is a valid, rational connection

27  between the prison [official's challenged conduct] and the legitimate governmental

28  interest put forward to justify it; [¶] (2) Whether there are alternative means of

1   exercising the right that remain open to prison inmates; [¶] (3) Whether

2   accommodation of the asserted constitutional right will impact . . . guards and other

3   inmates, and [] the allocation of prison resources generally; and (4) Whether there

4   is an 'absence of ready alternatives' versus the 'existence of obvious, easy

5   alternatives.'" Shakur, 514 F.3d at 884 (quoting Turner v. Safley, 482 U.S. 78, 89-

6   91 (1987), superseded by statute on other grounds, 42 U.S.C. §§ 2000cc, et seq.)

7   (other citation and internal quotation marks omitted); see also Beard v. Banks, 548

8   U.S. 521, 528 (2006) ("restrictive prison regulations are permissible if they are

9   'reasonably related to legitimate penological interests' . . . and are not an

10  'exaggerated response' to such objectives[].") (citation omitted); O'Lone, 482 U.S.

11  at 349 (applying Turner to free exercise claim); Jones v. Williams, 791 F.3d at

12  1031 (analyzing reasonableness of certain "government *action*" – as opposed to

13  specific "regulation" – that placed substantial burden on inmate's religious

14  practice); Salahuddin v. Goord, 467 F.3d 263, 274 n.4 (2d Cir. 2006) ("An

15  individualized decision to deny a prisoner the ability to engage in religious

16  exercise is analyzed in the same way as a prison regulation denying such

17  exercise.") (citation omitted).

18       It is a plaintiff's burden to plausibly show that an official did not act in a

19  reasonable manner under the circumstances. See, e.g., Overton v. Bazzetta, 539

20  U.S. 126, 132 (2003) ("The burden [] is not on the State to prove the validity of

21  prison regulations but on the prisoner to disprove it.") (citations omitted).

22              **3.     Freedom of Expression/Association**

23       Prisoners also retain limited First Amendment rights to free expression and

24  association. See Thornburgh v. Abbott, 490 U.S. 401, 407 (1989); Shaw, 532 U.S.

25  at 229. A prison official's limitation on inmate expression/assembly does not

26  violate the First Amendment if the particular restriction "is reasonably related to

27  legitimate penological interests" and "operated in a neutral fashion" (*i.e.*, was

28  applied "without regard to the content of the expression"), and the inmate was not

1   deprived of all means of expression.  <u>Turner</u>, 482 U.S. at 89 (citations omitted);

2   <u>Valdez v. Rosenbaum</u>, 302 F.3d 1039, 1048 (9th Cir. 2002) (citations omitted),

3   <u>cert. denied</u>, 538 U.S. 1047 (2003).  A plaintiff/inmate has the burden to show that

4   a government restriction on expression/assembly is not reasonable.  <u>See</u> <u>Overton</u>,

5   539 U.S. at 132 (citations omitted).

6   **4.    Right to Access the Courts**[6]

7   Prisoners also retain the First Amendment right "to petition the government

8   for a redress of [] grievances," which includes the specific right "to meaningful

9   access to the courts[.]" <u>Silva v. Di Vittorio</u>, 658 F.3d 1090, 1101-02 (9th Cir.

10  2011) (citation omitted), <u>abrogated on other grounds as stated in</u> <u>Richey v. Dahne</u>,

11  807 F.3d 1202, 1209 n.6 (9th Cir. 2015).  The constitutional right of access to the

12  courts generally requires prison officials to ensure that prisoners have the

13  "capability of bringing contemplated challenges to sentences or conditions of

14  confinement before the courts." <u>Lewis v. Casey</u>, 518 U.S. 343, 356 (1996).  To

15  that end, depending on the circumstances, prison officials may be required

16  affirmatively to "help prisoners exercise their rights" (*e.g.*, provide reasonable

17  access to "adequate law libraries or adequate assistance from persons trained in the

18  law"), or simply to refrain from "active interference" in prisoner litigation.  <u>Silva</u>,

19  658 F.3d at 1102 (citation omitted); <u>see, e.g.</u>, <u>Bounds v. Smith</u>, 430 U.S. 817, 828

20  (1977) (holding "that the fundamental constitutional right of access to the courts

21  requires prison authorities to assist inmates in the preparation and filing of

22  meaningful legal papers by providing prisoners with adequate law libraries or

23  adequate assistance from persons trained in the law") (footnote omitted), <u>overruled</u>

24  _____

25      [6]The United States Supreme Court has recognized that the basis of the constitutional right
26  of access to courts is somewhat unsettled.  <u>Christopher v. Harbury</u>, 536 U.S. 403, 415 & n.12
    (2002) (noting that decisions of U.S. Supreme Court have grounded right of access to courts in
27  the Article IV Privileges and Immunities Clause, the First Amendment Petition Clause, the Fifth
    Amendment Due Process Clause, and the Fourteenth Amendment Equal Protection and Due
28  Process Clauses) (citations omitted).

1  in part on other grounds, Lewis, 518 U.S. at 354.  Prison officials, however, are not

2  required to ensure access beyond "[t]he tools . . . inmates need in order to attack

3  their sentences, directly or collaterally, and in order to challenge the conditions of

4  their confinement."  Lewis, 518 U.S. at 355 ("*Bounds* does not guarantee inmates

5  the wherewithal to transform themselves into litigating engines capable of filing

6  everything from shareholder derivative actions to slip-and-fall claims. . . .

7  Impairment of [such] *other* litigating capacity is simply one of the incidental (and

8  perfectly constitutional) consequences of conviction and incarceration.").

9        To state a viable denial of access claim, a prisoner/plaintiff must plausibly

10  show that some official misconduct (*e.g.*, alleged inadequacies in the jail's library

11  facilities or legal assistance program) caused "actual injury" – that is, that it

12  frustrated or is impeding plaintiff's attempt to bring a nonfrivolous legal claim.

13  Lewis, 518 U.S. at 348-49; Nevada Department of Corrections v. Greene, 648 F.3d

14  1014, 1018 (9th Cir. 2011) (citation omitted), cert. denied, 132 S. Ct. 1823 (2012).

15  The plaintiff's complaint must describe the alleged underlying claim, whether

16  anticipated or lost, and show that it is "nonfrivolous" and "arguable."  See

17  Christopher v. Harbury, 536 U.S. 403, 415 (2002).

18        **D.    RLUIPA Claims**

19        RLUIPA prohibits state and local governments from "taking any action that

20  substantially burdens the religious exercise of an institutionalized person unless the

21  government demonstrates that the action constitutes the least restrictive means of

22  furthering a compelling governmental interest."  Holt v. Hobbs, 135 S. Ct. 853,

23  859 (2015).  RLUIPA provides more "expansive protection" of prisoners' religious

24  exercise than is available under the First Amendment.  Id. at 859-60; Shakur, 514

25  F.3d at 888 (RLUIPA "mandates a stricter standard of review for prison

26  regulations that burden the free exercise of religion than the reasonableness

27  standard under *Turner*") (citing Warsoldier v. Woodford, 418 F.3d 989, 994 (9th

28  Cir. 2005)); see also 42 U.S.C.A. § 2000cc-3 (RLUIPA "[to] be construed in favor

27

of a broad protection of religious exercise, to the maximum extent permitted by the terms of [RLUIPA] and the Constitution.") (citation omitted).

To state a claim under RLUIPA, a prisoner/plaintiff has the initial burden to plausibly allege that some government action imposed a "substantial burden" on the plaintiff's "religious exercise."  42 U.S.C.A. § 2000cc-1; Hartmann v. California Department of Corrections and Rehabilitation, 707 F.3d 1114, 1125 (9th Cir. 2013) ("To survive a motion to dismiss on [a] RLUIPA claim, plaintiffs must allege facts plausibly showing that the challenged policy and the practices it engenders impose a substantial burden on the exercise of their religious beliefs.") (citation omitted).  To merit protection under RLUIPA, a plaintiff's religious exercise need not be "compelled by, or central to, a system of religious belief," 42 U.S.C.A. § 2000cc-5(7)(A), nor need it be "shared by all of the members of a religious sect," Holt, 135 S. Ct. at 862 (citation and internal quotation marks omitted).  It does, however, need to be "sincerely based on a religious belief and not some other motivation[.]"  Holt, 135 S. Ct. at 862 (citing Burwell v. Hobby Lobby Stores, Inc. ("Hobby Lobby"), 134 S. Ct. 2751, 2774 n.28 (2014) ("pretextual assertion of a religious belief . . . for financial reasons" not "sincere")).

Government action imposes a substantial burden on a religious exercise for purposes of RLUIPA essentially if it compels a prisoner to choose between being punished and "seriously violat[ing]" the prisoner's sincerely-held religious beliefs. Id. (citing Hobby Lobby, 134 S. Ct. at 2775); Shakur, 514 F.3d at 888 ("[A] burden [on religious exercise] is substantial under RLUIPA when the state 'denies [an important benefit] because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs.'") (citations and internal quotation marks omitted); see also Oklevueha Native American Church of Hawaii, Inc. v. Lynch, 828 F.3d 1012, 1017 (9th Cir. 2016) (government policy substantially burdens religious exercise only if it forces prisoner to "choose between 'engag[ing] in conduct that seriously violates [his]

28

1  religious beliefs' or 'fac[ing] serious disciplinary action'") (citing <u>Holt</u>, 135 S. Ct.

2  at 862) (alterations in original; internal quotation marks omitted), <u>cert. denied</u>, __

3  U.S. __, 2016 WL 5636918 (Nov. 28, 2016).

4      If a plaintiff makes the required showing, the burden then shifts to the

5  defendant to establish that, as applied to the particular plaintiff, the challenged

6  government action/prison policy actually furthered "a compelling governmental

7  interest," and that the defendant used the "least restrictive means" to further the

8  interest.  42 U.S.C.A. § 2000cc-1(a); <u>see</u> <u>Holt</u>, 135 S. Ct. at 863 (citing <u>id.</u>).

9          **E.    Fourteenth Amendment Claims**[7]

10             **1.    Procedural Due Process**

11     To state a viable Section 1983 claim based upon denial of procedural due

12  process under the Fourteenth Amendment, a plaintiff must essentially allege

13  (1) government deprivation; (2) of a liberty or property interest protected by the

14  Constitution; (3) without adequate process.  <u>Portman v. County of Santa Clara</u>, 995

15  F.2d 898, 904 (9th Cir. 1993).

16     Inmates have a "due process liberty interest in receiving notice that [their]

17  incoming mail is being withheld by prison authorities."  <u>Frost v. Symington</u>, 197

18  F.3d 348, 353-54 (9th Cir. 1999) (citations omitted).  Thus, when prison officials

19  withhold delivery of an inmate's mail, minimum procedural safeguards must be

20  provided, including notice to the inmate that his or her mail was held, and the right

21  ///

22

23

24  ────────────────

25       [7]To the extent plaintiff asserts violations of due process and equal protection under the
    Fifth Amendment, the Second Amended Complaint fails to state a viable Section 1983 claim

26  because the Fifth Amendment's due process and equal protection clauses apply to the federal
    government and none of the defendants is a federal employee or entity.  <u>See generally</u> <u>Bingue v.</u>

27  <u>Prunchak</u>, 512 F.3d 1169, 1174 (9th Cir. 2008).  The Court considers plaintiff's due process and
    equal protection claims under the rubric of the Fourteenth Amendment, which applies to states

28  and municipalities.

1  to appeal the decision to a different prison official.  Krug v. Lutz, 329 F.3d 692,
2  697-98 (9th Cir. 2003) (citations omitted).

3      The Due Process Clause protects only those property interests to which a
4  plaintiff had "a legitimate claim of entitlement."  See Parks v. Watson, 716 F.2d
5  646, 656 (9th Cir. 1983).  Whether an individual has a protected property interest is
6  generally determined under state law.  Doyle v. City of Medford, 606 F.3d 667,
7  672 (9th Cir. 2010) (citation omitted); Soranno's Gasco, Inc. v. Morgan, 874 F.2d
8  1310, 1316 (9th Cir. 1989).

9                   **2.    Equal Protection**

10      The Equal Protection Clause of the Fourteenth Amendment requires that
11  persons who are similarly situated be treated alike.  City of Cleburne, Texas v.
12  Cleburne Living Center, 473 U.S. 432, 439 (1985), abrogated on other grounds as
13  explained in Galbraith v. County of Santa Clara, 307 F.3d 1119, 1125- 26 (9th Cir.
14  2002).  To state an equal protection claim, a plaintiff must plausibly allege that he
15  was intentionally discriminated against on the basis of membership in a protected
16  class.  See, e.g., Lee v. City of Los Angeles, 250 F.3d 668, 686 (9th Cir. 2001),
17  implicitly abrogated in part on other grounds as stated in Galbraith, 307 F.3d at
18  1125- 26.  Under this theory of equal protection, the plaintiff must show that the
19  defendant's actions were a result of the plaintiff's membership in a suspect class,
20  such as race.  Thornton v. City of St. Helens, 425 F.3d 1158, 1167 (9th Cir. 2005).

21      If the action in question does not involve a suspect classification, a plaintiff
22  may establish an equal protection claim by showing that similarly situated
23  individuals were intentionally treated differently without a rational relationship to a
24  legitimate state purpose.  Village of Willowbrook v. Olech, 528 U.S. 562, 564
25  (2000); San Antonio Independent School District v. Rodriguez, 411 U.S. 1 (1972);
26  SeaRiver Maritime Financial Holdings, Inc. v. Mineta, 309 F.3d 662, 679 (9th Cir.
27  2002).  To state an equal protection claim under this theory, a plaintiff must
28  plausibly allege that:  (1) the plaintiff is a member of an identifiable class; (2) the

1  plaintiff was intentionally treated differently from others similarly situated; and

2  (3) there is no rational basis for the difference in treatment.  <u>Village of</u>

3  <u>Willowbrook</u>, 528 U.S. at 564.

4  **IV.  DISCUSSION**

5       **A.  The Second Amended Complaint Fails to State Viable Section**

6            **1983 Claims Against Defendants Stainer, Soto, and Harris**

7            **1.  Defendants Stainer and Soto**

8         Like its predecessor, the Second Amended Complaint fails to state a viable

9  individual capacity claim against defendants Stainer and Soto.  For example, the

10  Second Amended Complaint does not plausibly allege that defendant Stainer or

11  defendant Soto did any specific affirmative act or acts, participated in another's

12  affirmative acts, failed to perform a legally required act, or set in motion a series of

13  acts by others which such defendants knew or reasonably should have known

14  would result in constitutional injury to plaintiff.  Nor does the Second Amended

15  Complaint plausibly allege that defendant Stainer or defendant Soto personally

16  participated in or directed a subordinate's constitutional violation, or engaged in

17  any other specific wrongful conduct which *plausibly* caused plaintiff's

18  constitutional deprivation.  Plaintiff's conclusory allegations that defendant Stainer

19  is "legally responsible to ensure that all prisoners in the CDCR be afforded their

20  First Amendment right to free exercise of religion guaranteed under RLUIPA" and

21  that defendant Soto has the same legal responsibility at CSP-LAC (SAC Att. ¶¶ 3-

22  4) are insufficient to state a viable civil rights claim against either defendant.  <u>See</u>

23  <u>Pena v. Gardner</u>, 976 F.2d 469, 471 (9th Cir. 1992) (Vague and conclusory

24  allegations of official participation in civil rights violations are not sufficient to

25  state a claim under Section 1983.) (citing <u>Ivey v. Board of Regents of the</u>

26  <u>University of Alaska</u>, 673 F.2d 266, 268 (9th Cir. 1982)); <u>see also</u> <u>Iqbal</u>, 556 U.S.

27  at 680-84 (conclusory allegations in complaint which amount to nothing more than

28  a "formulaic recitation of the elements" of a cause of action are insufficient under

pleading standard in Fed. R. Civ. P. 8) (citations omitted).  Similarly, and as further discussed below, plaintiff's conclusory allegations that defendants Stainer and Soto violated the Establishment Clause through a policy which gave exclusive authority to defendant Lazar to determine who can receive a Kosher diet (SAC Att. ¶ 28) are insufficient to state a viable claim against either defendant.

Likewise, plaintiff's multiple other conclusory allegations against such two defendants (*e.g.*, that defendant Soto was "grossly negligent in supervising subordinates who committed the wrongful acts of returning [] plaintiff's legal mail to the Court without notification" (SAC Att. ¶ 25); that defendants Stainer and Soto were informed through "an appeal" of an unspecified "violation" but "failed to remedy the wrong" (SAC Att. ¶ 29); that the two defendants "created a policy or custom under which unconstitutional practices occurred and allowed the continuance of such policy or custom" (SAC Att. ¶ 29); that such defendants were "grossly negligent in supervising subordinates who committed wrongful acts" and the defendants "exhibited deliberate indifference to the rights of plaintiff by failing to act on information indicating that unconstitutional acts were occurring" (SAC Att. ¶ 29) – are insufficient to state a plausible Section 1983 claim.  See Pena, 976 F.2d at 471 (citation omitted); Iqbal, 556 U.S. at 680-84 (citations omitted).  Similarly, plaintiff has not stated a viable Section 1983 claim based on his conclusory allegations scattered throughout the Second Amended Complaint that various actions by one or more defendants was a "violation" of multiple constitutional rights (SAC Att. ¶¶ 11, 13, 14, 19, 22, 25-27, 28-35).  Id.

To the extent plaintiff is alleging that defendants Stainer and Soto violated the Constitution because they generally failed to prevent their subordinates from engaging in official misconduct, such allegation, without more, fails to state a viable Section 1983 claim.  Again a federal civil rights claim may not be based

///

1   solely on a defendant's supervisory position.  See Taylor, 880 F.2d at 1045 ("There

2   is no respondeat superior liability under section 1983.") (citation omitted).

### 2.      Defendant Harris

4        The Second Amended Complaint also fails to state a viable Section 1983

5   claim against defendant Harris.  Plaintiff's claims against defendant Harris, at

6   most, appear to be predicated upon the alleged improper processing of Appeal #

7   LAC-B-13-02501.  (SAC Att. ¶¶ 13-14, 32).  Nonetheless, a prison official's

8   processing of an inmate's appeals, without more, cannot serve as a basis for

9   Section 1983 liability.  See Ramirez v. Galaza, 334 F.3d 850, 860 (9th Cir. 2003)

10  (Prisoners do not have a "separate constitutional entitlement to a specific prison

11  grievance procedure.") (citation omitted), cert. denied, 541 U.S. 1063 (2004);

12  Mann v. Adams, 855 F.2d 639, 640 (9th Cir.) (due process not violated simply

13  because defendant fails properly to process grievances submitted for

14  consideration), cert. denied, 488 U.S. 898 (1988); see, e.g., Todd v. California

15  Department of Corrections and Rehabilitation, 615 Fed. Appx. 415, 415 (9th Cir.

16  2015) (district court properly dismissed claim based on improper "processing and

17  handling of [] prison grievances," since prisoners have no "constitutional

18  entitlement to a specific prison grievance procedure") (quoting Ramirez, 334 F.3d

19  at 860) (quotation marks omitted); Shehee v. Luttrell, 199 F.3d 295, 300 (6th Cir.

20  1999) (prison officials whose only roles involved the denial of inmate's

21  administrative grievances cannot be held liable under Section 1983), cert. denied,

22  530 U.S. 1264 (2000).

23       While a prison official's alleged failure to process an inmate grievance may

24  implicate a prisoner's First Amendment right of access to the courts, the Second

25  Amended Complaint fails to state such a claim against defendant Harris because

26  plaintiff does not *plausibly* allege that the defendant *actually failed* to process

27  plaintiff's grievances, that an actual injury resulted from any failure to process

28  plaintiff's grievances, or that any alleged misconduct actually "hindered

[plaintiff's] efforts to pursue a [nonfrivolous] legal claim." <u>Lewis</u>, 518 U.S. at 351-53, 354-55 (To establish <u>any</u> denial of access claim, a plaintiff must show that he suffered an "actual injury" as a result of the defendants' actions.); <u>see also</u> <u>Bounds</u>, 430 U.S. at 821 (well-established that prisoners have a constitutional right of access to the courts). Here, plaintiff's conclusory allegation that defendant Harris "refused to process [Appeal # LAC-B-13-02501]" (SAC Att. ¶ 14) is contradicted by plaintiff's other allegations and exhibits which more precisely reflect that defendant Harris returned Appeal # LAC-B-13-02501 to plaintiff several times on screening but did not outright refuse to process plaintiff's appeal in the first instance. (SAC Att. ¶¶ 13-14; Ex. B at 38-41).

**B.     The Second Amended Complaint Fails to State a Viable First Amendment Establishment Clause Claim Against Any Defendant**

Preliminarily, the Second Amended Complaint does not reasonably appear to assert any claim for violation of the Establishment Clause predicated on the denial of plaintiff's requests for Ritual Herbal Smoke Blends and/or a religious name change. (<u>See</u> SAC Att. ¶¶ 16-31). Accordingly, in this section the Court addresses plaintiff's Establishment Clause claims only with respect to allegations that plaintiff was denied a Jewish kosher diet and separate religious services.

First, plaintiff's conclusory allegations that during the administrative process defendants Stainer and Soto violated the "Constitution [sic] protection against the 'establishment of religion'" essentially by failing to reverse defendant Lazar's denial of plaintiff's Religious Diet Request (SAC Att. ¶ 11) are insufficient to state a viable Establishment Clause claim. <u>See</u> <u>Pena</u>, 976 F.2d at 471 (citation omitted); <u>Iqbal</u>, 556 U.S. at 680-84 (citations omitted). Plaintiff's allegation that it was improper to delegate to defendant Lazar the *exclusive* authority to review inmate religious diet requests (SAC Att. ¶ 28) likewise does not state a viable Establishment Clause claim. <u>Cf., e.g.,</u> <u>Resnick v. Adams</u>, 348 F.3d 763, 769 (9th Cir. 2003) (requiring inmates seeking religious accommodation to complete

"standardized form" application for religious meals so that, among other things, a "chaplain [can] assess the sincerity of the applicant's belief . . ." rationally related to legitimate government interest in administration of religious meal program).

The Second Amended Complaint also does not state a viable Establishment Clause claim based on the alleged failure to grant plaintiff's Requests for Religious Services.  As the discussion below regarding plaintiff's free exercise claim suggests, the Second Amended Complaint, at a minimum, does not plausibly allege that denial of plaintiff's request to hold *separate* religious services and/or study programs had the primary effect of advancing or inhibiting religion.  For example, plaintiff has not shown that denial of his requests for religious services coerced plaintiff into following or foregoing any particular religion or its exercise.  To the contrary, Rabbi Chaimberlin's Letter suggests that plaintiff's personal religious needs could have been just as easily met by plaintiff attending "traditional Jewish services" that were already available.  (See Ex. B at 36).  In addition, the Second Amended Complaint does not allege that there was any demand for the religious services plaintiff proposed, much less that failure to grant the *separate* services plaintiff requested denied any significant number of plaintiff's followers a reasonable opportunity to pursue their faith in comparison with other inmate religious groups at CSP-LAC.  See, e.g., Cruz v. Beto, 405 U.S. 319, 322 & n.2 (1972) (observing that Constitution does not require "every religious sect or group within a prison – however few in number – [to] have identical facilities or personnel[,]" and that prison officials need not provide "[a] special chapel or place of worship" or a "chaplain, priest, or minister" for every faith "regardless of size" and/or "without regard to the extent of the demand[]").

Consequently, the Second Amended Complaint fails to state a viable First Amendment Establishment Clause claim.

///

**C.      The Second Amended Complaint Fails to State a Viable First Amendment Free Exercise Claim Against Any Defendant**

The Second Amended Complaint fails to state a viable First Amendment, free exercise claim against any defendant predicated on the alleged denial of plaintiff's requests for (a) a Jewish kosher diet; (b) separate religious services; (c) "Ritual Herbal Smoke Blends" or (d) a religious name change.

**1.      Denial of Religious Diet Request**

The Second Amended Complaint fails to state a viable First Amendment, free exercise claim predicated on the alleged denial of plaintiff's request for the "Jewish Kosher" religious meal option.

First, the Second Amended Complaint – like its predecessor – does not plausibly allege that denial of a kosher diet, *per se*, impacted a religious belief *sincerely* held by plaintiff *personally*.  For example, plaintiff alleges that Appeal # LAC-B-12-01824 stated that "the Holy Kabbalah and Messianic - Hermetic Order of Melchizedek requires to [sic] maintain a Kosher diet for his spiritual edification base [sic] upon the Tradition of the Holy Seed and his sincere religious belief and practice."  (SAC Att. ¶ 10).  In Appeal # LAC-B-12-01824, however, plaintiff simply complained that defendant Lazar "denied [plaintiff's] request for Kosher Diet alleging that the 'Jewish Kosher Diet is for Jewish inmates[,]" and asserted that "[defendant] Lazar [had] not put forth a compelling government interest in denying [plaintiff] a Kosher Diet."  (SAC Att. ¶ 9; Ex. A at 17-18).  Without more, the mere fact that plaintiff requested and was denied the Jewish kosher diet option does not plausibly *show* that plaintiff's sincerely held *religion* required him to maintain a Jewish Kosher diet *exclusively*.

Even assuming, for the sake of analysis only, that "the Holy Kabbalah and Messianic – Hermetic Order of Melchizedek" and "Tradition of the Holy Seed" refer to a "religious" practice – *e.g.*, a comprehensive moral, ethical, or other belief system entitled to protection under the Free Exercise Clause – allegations in the

1    Second Amended Complaint, again, do not plausibly *show* that any such *religious*

2    practice mandated a kosher diet *exclusively*.  Nor does plaintiff allege sufficient

3    non-conclusory facts which plausibly reflect that plaintiff *personally* adhered to

4    such dietary requirement, much less did so "with the strength of traditional

5    religious convictions[.]"  Ward, 989 F.2d at 1018.  Conclusory allegations that a

6    Kosher diet was generally required "for [] spiritual edification" and "base[d] upon

7    . . . [plaintiff's] sincere religious belief and practice" (SAC Att. ¶ 10) amount to

8    nothing more than a formulaic recitation of the elements of a free exercise claim

9    which, as noted above, is insufficient to state a viable claim for relief.  See Pena,

10   976 F.2d at 471 (citation omitted); Iqbal, 556 U.S. at 680-84 (citations omitted).

11        As for the Religious Diet Request form itself, plaintiff's conclusory

12   statements therein – *i.e.*, that his "[r]eligion" since 1998 was "Judaism," his cryptic

13   assertion to "See Leviticus Chapter 11" when asked in the form to state the

14   "dietary laws to which [plaintiff] must adhere, and the tenets of [his] religion," and

15   plaintiff's evasive and confusing explanation for why his "religious dietary needs"

16   generally could not be met by avoiding pork, and/or following a vegetarian diet

17   (Ex. A at 19) – also do not *plausibly* support an inference that plaintiff's sincerely-

18   held religious beliefs limited him to a Jewish kosher diet only.  Indeed, such an

19   inference is directly contradicted by Rabbi Chaimberlin's Letter which plaintiff

20   submitted in support of his Religious Diet Request.  (Ex. A at 17-21).  In his letter,

21   Rabbi Chaimberlin, among other things, opined about the "spiritual needs of

22   Messianic Jewish prisoners" generally, and specifically (1) noted that plaintiff

23   "may or may not have Jewish ancestry" but did wish his religious preference to

24   read "Messianic Judaism"; and (2) conveyed plaintiff's precise religious dietary

25   "requests" as simply (a) a diet "free from pork and shellfish" at all times – which,

26   according to Rabbi Chaimberlin, is "the same" diet followed by many Jewish

27   prisoners "in many states"; and (b) a diet "free of leavened products during the

28   week of Passover."  (Ex. A at 21).  In addition, while Rabbi Chaimberlin's Letter

did convey that plaintiff *preferred* a kosher diet (*i.e.*, "If possible, [plaintiff] might like a kosher diet"), it also notes that plaintiff was willing to "have a vegetarian diet" which met the above criteria if a kosher diet was not available.  (Ex. A at 21).

Second, the Second Amended Complaint also does not plausibly allege that deeming plaintiff ineligible for the CSP-LAC *Jewish kosher* meal option had a tendency to coerce plaintiff into violating any of his personal, sincerely-held religious beliefs.  While it is conceivable that plaintiff actually and sincerely believed that eating anything but a Jewish kosher diet seriously violated his religious dietary needs, in light of the foregoing discussion, such a mere possibility, without specific factual support, is insufficient to render plausible plaintiff's claim that denial of his Religious Diet Request placed a substantial burden on a religious exercise mandated by his sincerely-held religious beliefs. Moreover, like its predecessor, the Second Amended Complaint does not plausibly allege that defendants' specific actions were the cause of any substantial burden on plaintiff's religious exercise.  For example, the Second Amended Complaint and plaintiff's exhibits reflect, in pertinent part, that CSP-LAC officials did not categorically refuse plaintiff's request for the Jewish kosher religious meal option, but instead denied plaintiff's Religious Diet Request essentially because plaintiff had not provided "sufficient information to substantiate" that he was eligible for the meal option he requested.  (SAC Att. ¶ 11; Ex. A at 18, 23-27).  To the extent plaintiff contends that defendants placed a substantial burden on plaintiff's religious exercise because they required him to submit a Religious Diet Request form which provided enough specific information to permit an accurate assessment of plaintiff's eligibility for the Jewish kosher diet option, he fails to state a viable free exercise claim.  Cf., e.g., Resnick v. Adams, 348 F.3d 763, 767-72 & n.6 (9th Cir. 2003) (requiring inmates to submit standardized form application with "written statement articulating the religious motivation for"

///

1   seeking accommodation of religious dietary needs "is by no stretch a 'substantial'
2   burden" on religious exercise for purposes of RLUIPA).

3          Finally, even if denial of plaintiff's Religious Diet Request arguably placed
4   a substantial burden on plaintiff's sincerely-held religious belief, the Second
5   Amended Complaint does not plausibly allege that such denial was an exaggerated
6   response under the circumstances.  "[T]he orderly administration of a program that
7   allows [] prisons to accommodate the religious dietary needs of thousands of
8   prisoners" is a "legitimate governmental interest." Resnick, 348 F.3d at 769
9   (citations omitted); see also McCoy v. County of Riverside, 2015 WL 134285, *4
10  (C.D. Cal. Jan. 9, 2015) ("The Ninth Circuit has repeatedly found that ensuring
11  compliance with a prison's procedural rules for filing of prison grievances is a
12  legitimate penological interest.") (citing Barnett v. Centoni, 31 F.3d 813, 816 (9th
13  Cir. 1994); Heilman v. Sanchez, 583 Fed. Appx. 837 (9th Cir. 2014)).  Such a
14  legitimate interest may constitutionally be furthered by requiring inmates to
15  complete a standardized form request for accommodation of a religious dietary
16  need which, among other things, provides prison officials with sufficient
17  information to permit "the chaplain to assess the sincerity of the applicant's
18  [religious] belief. . . ." Resnick, 348 F.3d at 769; cf., e.g., Harris v. Lake County
19  Sheriff's Department, 2015 WL 5138388, *5 (N.D. Cal. Sept. 1, 2015) (concluding
20  "as a matter of law that the requirement that inmates use their first and last names
21  when filing grievances advances the legitimate penological interest of accurately
22  and speedily administering the prison grievance system").  Thus, in this case, the
23  Second Amended Complaint and plaintiff's exhibits show a valid, rational link
24  between the asserted justification for denying plaintiff's Religious Diet Request
25  (i.e., plaintiff's failure to provide sufficient information to establish his eligibility
26  for the Jewish kosher diet option) (SAC Att. ¶¶ 9-11; Ex. A at 23-26), and the
27  legitimate penological goal of ensuring efficient administration of the CSP-LAC
28  religious diet program.  See, e.g., Resnick, 348 F.3d at 769 ("valid, rational

connection" between "orderly administration of [inmate religious diet] program" and prison regulation that conditions receipt of kosher diet on inmate submission of standardized application form which, among other things, enables chaplain adequately to assess sincerity of applicant's religious beliefs). In addition, as also discussed above, there apparently was an obvious, and easy alternative means for plaintiff to meet his religious dietary needs (*e.g.*, acceptance of the CSP-LAC offer of the vegetarian diet option). <u>See, e.g.</u>, <u>Overton</u>, 539 U.S. at 135 (alternative means of exercising constitutional right "need not be ideal," they just need to be "available").

Consequently, the Second Amended Complaint fails to state a viable First Amendment free exercise claim predicated on the denial of a Jewish Kosher religious meal option.

### 2.    Failure to Permit Religious Services

The Second Amended Complaint also fails to state a viable free exercise claim predicated on the alleged failure to grant plaintiff's First and Second Requests for Religious Services.

First, the rambling, vague, and confusing allegations in paragraphs 13 and 14 of the "Second Amended Complaint" (SAC Att. ¶¶ 13, 14), like similar paragraphs in the First Amended Complaint, are insufficient to state any claim for relief consistent with Rule 8 pleading standards. <u>Cf., e.g.</u>, <u>Knapp v. Hogan</u>, 738 F.3d 1106, 1109 (9th Cir. 2013) (needlessly long, prolix, or confusing complaints may be dismissed as failing to state a claim for relief under Rule 8 pleading standard), <u>cert. denied</u>, 135 S. Ct. 57 (2014).

Second, the Second Amended Complaint does not plausibly allege that denial of plaintiff's Requests for Religious Services placed a substantial burden on plaintiff's sincerely-held religious exercise. For example, the Second Amended Complaint alleges that plaintiff requested separate "Messianic Hebrew Services" for the general "purpose of promoting, encouraging, developing, and organizing

Kabbalist studies and meditation class" (SAC Att. ¶ 12; Ex. B at 32-33), and that the "[t]he aim" of the proposed Friday services was "to teach in the Hermetic Science or Occult Knowledge, the Pure and Holy Magick [sic] of Light, the Secrets of Mystic attainment of the Secret Wisdom of the Ancients after the Messianic - Hermetic Order of Melchizedek." (SAC Att. ¶ 12; Ex. B at 32). Plaintiff's request letter to Mr. Hunter reflects that plaintiff had also said the program he proposed "can benefit the institution by creating a harmonized environment and offer inmates the opportunity of rehabilitation and hope." (Ex. B at 32). Nonetheless, the simple description of the purposes, goals, and potential benefits of the proposed programs is insufficient to show that the holding of *separate* religious services and/or study programs, as plaintiff requested, was *per se* grounded in plaintiff's personal religious practice, such that denial of plaintiff's request tended to coerce plaintiff into foregoing or violating a specific, sincerely-held religious exercise. Indeed, Rabbi Chaimberlin's Letter – which also appears to have been submitted with plaintiff's Requests for Religious Services – directly contradicts such inferences. (See Ex. B at 36 ["If there are no Messianic Jewish services, please ensure that [plaintiff] will be able to attend the traditional Jewish services."]).

Consequently, the Second Amended Complaint fails to state a viable First Amendment, free exercise claim predicated on the alleged failure to grant plaintiff's First and Second Requests for Religious Services.

### 3. Denial of Ritual Herbal Smoke Blends

The Second Amended Complaint also fails to state a viable free exercise claim predicated on the alleged denial of plaintiff's request for "Ritual Herbal Smoke Blends."

First, the Second Amended Complaint does not plausibly allege that defendant Garcia *caused* any constitutional violation related to such denial. Plaintiff's allegation that on July 31, 2014, defendant Garcia "refused to issue plaintiff his Ritual Herbal Smoke Blends" does not plausibly show that it was

within defendant Garcia's duties and responsibilities to address plaintiff's request at all, much less that the failure to do so on the single occasion caused a constitutional violation.  Indeed, plaintiff's own exhibits belie such conclusions.  For example, in an Inmate Request dated August 4, 2014, plaintiff asserted that defendant Garcia had "refused" plaintiff's request essentially because the request needed to be addressed by a different official (*i.e.* a "Sergeant").  (Ex. E at 92).  Moreover, as noted above, Chief Deputy Biaggini expressly stated that plaintiff's request for Ritual Herbal Smoke Blends had not been "approved" – contrary to plaintiff's unsupported allegations here and in his prison grievances (SAC Att. ¶¶ 19-20; Ex. E at 80-83, 87-90, 92-94) – and that prison staff had, in fact, properly *followed* prison policy by *not* issuing the requested smoking blends to plaintiff.  (Ex. E at 87-88) (emphasis added).  Conclusory allegations that defendant Garcia had expressed strong disapproval of plaintiff's religious use of Ritual Herbal Smoke Blends (SAC Att. ¶ 19), even if true, are insufficient to state a viable claim for relief.  Cf., e.g., Oltarzewski v. Ruggero, 830 F.2d 136, 139 (9th Cir. 1987) (claims of verbal harassment or abuse do not state a constitutional deprivation) (citation omitted).

Second, even so, as with the identical allegations in the Original and First Amended Complaints, the Second Amended Complaint does not plausibly allege that the Ritual Herbal Smoke Blends were part of any *religious* practice in the first instance, much less one that was "sincerely-held" by plaintiff.  For example, even if true, allegations that the Ritual Herbal Smoke Blends could "reduce coughing, repair lung tissue[], aid in weight control, lower blood pressure, and relieve chronic pain" (FAC Att. ¶¶ 13, 15) describe health, not religious, benefits.  Plaintiff's conclusory allegations that such health benefits "[were] a practice protected under the First Amendment of the Constitution of 'Free Exercise' of religion, and under RULIPA [sic]" (SAC Att. ¶ 16) are insufficient to plausibly suggest otherwise.  See Pena, 976 F.2d at 471 (citation omitted); Iqbal, 556 U.S. at 680-84 (citations

omitted).  Similarly, plaintiff's general allegations regarding the possible use and benefits of the Ritual Herbal Smoke Blends (*i.e.*, that they were "utilized in ceremonies as a sacrament with mystical observance, somatic consciousness, sensitivities and magical enchantment when engaged in magical rites," that "a metaphysical practitioner" would use the Ritual Herbal Smoke Blends "as a way to encourage intuition, clairvoyance and psychic attention," and to "aid in vision quest") (SAC Att. ¶ 16) do not plausibly suggest that plaintiff personally used the Ritual Herbal Smoke Blends in the manner described, much less did so for any specific *religious* purpose at all.  Nor do they provide any indication of the strength of plaintiff's personal devotion to any alleged religious practice.  The conclusory assertion in plaintiff's August 17, 2013 Letter that the Ritual Herbal Smoke Blends were "essential to [plaintiff's] religious practice" (Ex. D at 58) is also insufficient. See Pena, 976 F.2d at 471 (citation omitted); Iqbal, 556 U.S. at 680-84 (citations omitted).

Moreover, while it is possible that using Ritual Herbal Smoke Blends "to encourage intuition, clairvoyance or psychic attention" and "to aid in vision quest" of "a metaphysical practitioner" furthers a religious practice, it is also possible to infer that such use furthers a purely secular pursuit (*e.g.*, interpreting "metaphysical" as referring to a branch of philosophy), which is not protected by the Free Exercise Clause.  Thus, plaintiff may not rely on such allegations to plausibly show that the Ritual Herbal Smoke Blends were part of plaintiff's exercise of a sincerely-held, religious belief.  See, e.g., In re Century Aluminum Co. Securities Litigation, 729 F.3d 1104, 1108 (9th Cir. 2013) (when allegations in complaint are consistent with "two possible," but contradictory inferences, – "only one of which can be true and only one of which results in liability" – plaintiffs may not rely on allegations that are "'merely consistent with' their favored explanation but are also consistent with the alternative [inference]" to render their allegations "plausible within the meaning of *Iqbal* and *Twombly*," but instead must allege

43

"[s]omething more," such as "facts tending to exclude the possibility that the alternative explanation is true") (citing <u>Iqbal</u>, 556 U.S. at 678; <u>Twombly</u>, 550 U.S. at 554, 557, 567).

Finally, the Second Amended Complaint also does not plausibly allege that the denial of plaintiff's request for Ritual Herbal Smoke Blends imposed a substantial burden on any religious practice plaintiff sincerely held.  For example, allegations that the Ritual Herbal Smoke Blends could "encourage" or "aid" certain mental states, or provide various health benefits, do not plausibly show that the prohibition of such substances coerced plaintiff personally into giving up or violating any particular, sincerely-held religious belief.  <u>See, e.g.</u>, <u>Navajo Nation v. United States Forest Service</u>, 535 F.3d 1058, 1063 (9th Cir. 2008) (en banc) ("[A] government action that decreases the spirituality, the fervor, or the satisfaction with which a believer practices his religion is not what Congress has labeled a 'substantial burden' . . . on the free exercise of religion."), <u>cert. denied</u>, 556 U.S. 1281 (2009); <u>cf., e.g.</u>, <u>Jones v. Williams</u>, 791 F.3d at 1031-33 (a "substantial burden" must be "more than an inconvenience on religious exercise") (citations omitted).

Consequently, the Second Amended Complaint fails to state a viable free exercise claim predicated on the alleged denial of plaintiff's request for "Ritual Herbal Smoke Blends."

### 4. Denial of First Religious Name Change Request – Statute of Limitations Bar

Like the First Amended Complaint, the Second Amended Complaint fails to state a timely free exercise claim predicated on the denial of the First Religious Name Change Request.

///

///

### a.   Pertinent Law

A time-barred claim may be dismissed at the screening stage when expiration of the applicable statute of limitations is apparent on the face of the complaint.  See Belanus v. Clark, 796 F.3d 1021, 1024-27 (9th Cir. 2015) (affirming dismissal of *pro se* complaint upon screening pursuant to 28 U.S.C. § 1915A, in part because prisoner's complaint, on its face, appeared to be time-barred), cert. denied, 137 S. Ct. 109 (2016); Huynh v. Chase Manhattan Bank, 465 F.3d 992, 997 (9th Cir. 2006) (running of statute of limitations must be "apparent on the face of the complaint" to warrant dismissal under Rule 12(b)(6)), cert. denied, 564 U.S. 1037 (2011); Franklin v. Murphy, 745 F.2d 1221, 1229 (9th Cir. 1984) ("An action may be dismissed under [IFP statute] where the defense is complete and obvious from the face of the pleadings or the court's own records.").

### i.   Length Of Statutory Period

The two-year statute of limitations for California personal injury actions (*i.e.*, the limitations period applicable to an analogous cause of action under state law) governs plaintiff's Section 1983 claims.  See, e.g., Pouncil v. Tilton, 704 F.3d 568, 573 (9th Cir. 2012) (citing Wallace v. Kato, 549 U.S. 384, 387 (2007)), cert denied, 134 S. Ct. 76 (2013); Maldonado v. Harris, 370 F.3d 945, 954-55 (9th Cir. 2004), cert. denied, 544 U.S. 968 (2005)).  The federal, four-year statute of limitations governs plaintiff's RLUIPA claim.  See Pouncil, 704 F.3d at 573 (citing Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 382 (2004)); see, e.g., United States v. Maui County, 298 F. Supp. 2d 1010, 1013 (D. Haw. 2003) (applying four-year statute of limitations to RLUIPA civil rights claims) (citing, *inter alia*, 28 U.S.C. § 1658); Congregation Adas Yereim v. City of New York, 673 F. Supp. 2d 94, 107 (E.D.N.Y. 2009) ("It is undisputed that the four-year catch-all federal statute of limitations, codified at 28 U.S.C. § 1658(a), governs claims brought under RLUIPA.") (citations omitted).

///

45

1

### ii.    Accrual of Claims

2        Under federal law, both Section 1983 and RLUIPA claims "accrue" – that is,

3   the statute of limitations begins to run – "when the plaintiff knows or has reason to

4   know of the injury that is the basis of the action."  <u>Belanus</u>, 796 F.3d at 1025

5   (citation omitted); <u>Maldonado</u>, 370 F.3d at 955 (citations and quotation marks

6   omitted); <u>see also</u> <u>Pouncil</u>, 704 F.3d at 574 ("An action ordinarily accrues on the

7   date of the injury.") (citations omitted).

8

### iii.    Statutory Tolling

9        In Section 1983 cases, federal courts apply the forum state's law regarding

10  tolling except to the extent such law is inconsistent with federal law.  <u>Jones v.</u>

11  <u>Blanas</u>, 393 F.3d 918, 927 (9th Cir. 2004), <u>cert. denied</u>, 546 U.S. 820 (2005).  For

12  example, California law provides for the tolling of a statute of limitations for a

13  period of up to two years based on a disability of imprisonment – <i>i.e.,</i> when a

14  plaintiff is imprisoned on a criminal charge or in the execution under the sentence

15  of a criminal court for a term less than life.  <u>Jones v. Blanas</u>, 393 F.3d at 927; Cal.

16  Civ. Proc. Code § 352.1 ("Section 352.1").

17       The Court has located no statutory tolling provision in RLUIPA.  <u>See</u>

18  42 U.S.C. §§ 2000cc-2000cc5.  Nor has the Court located any case law which

19  suggests that statutory tolling applies to RLUIPA.

20

### iv.    Equitable Tolling

21       In Section 1983 cases, federal courts apply the forum state's law regarding

22  equitable tolling, except to the extent such law is inconsistent with federal law.

23  <u>Jones v. Blanas</u>, 393 F.3d at 927 (citation omitted).  California courts have applied

24  equitable tolling "in carefully considered situations to prevent the unjust technical

25  forfeiture of causes of action, where the defendant would suffer no prejudice."

26  <u>Lantzy v. Centex Homes</u>, 31 Cal. 4th 363, 370 (2003) (collecting cases).  The

27  California Supreme Court has described equitable tolling as "a judge-made

28  doctrine which operates independently of the literal wording of the California Code

of Civil Procedure to suspend or extend a statute of limitations as necessary to ensure fundamental practicality and fairness." Id. (citations and internal quotation marks omitted). Under California law, to merit equitable tolling of a statute of limitations, a plaintiff must meet three conditions, namely the "(1) defendant must have had timely notice of the claim; (2) defendant must not be prejudiced by being required to defend the otherwise barred claim; and (3) plaintiff's conduct must have been reasonable and in good faith." Fink v. Shedler, 192 F.3d 911, 916 (9th Cir. 1999) (citation and quotation marks omitted), cert. denied, 529 U.S. 1117 (2000); see also Addison v. State of California, 21 Cal. 3d 313, 319 (1978) (citations omitted).

The Court has located no authority which addresses whether equitable tolling applies in RLUIPA cases, but assumes, for purposes of analysis only, that it does.

### b. Analysis

Here, it is again apparent from the face of plaintiff's operative pleading – the Second Amended Complaint – that to the extent plaintiff's free exercise (or other) claim against defendant Runnels or any other defendant is predicated on the alleged denial of the First Religious Name Change Request, it is time-barred. Any such claim accrued no later than September 12, 2005 – i.e., the date on which plaintiff alleges the First Religious Name Change Request was denied at the Director's Level. (SAC Att. ¶ 24) (citing Ex. F). Even under the more lengthy, four-year limitation period, and even assuming statutory tolling of two years pursuant to Section 352.1 (i.e., based on plaintiff's imprisonment), the limitations period for a claim predicated upon the denial of the First Religious Name Change Request, expired no later than September 12, 2011. Nor does the Second Amended Complaint plausibly allege that plaintiff would be entitled to equitable tolling, let alone equitable tolling sufficient to render such claim timely filed. More specifically, since the Second Amended Complaint reflects, at most, that in 2005

defendant Runnels denied plaintiff's First Religious Name Change Request, and the Chief of the CDCR Inmate Appeals Branch (not a defendant) upheld the denial on appeal (SAC Att. ¶ 24; Ex. F at 98), it cannot reasonably be inferred that any defendant other than defendant Runnels was ever notified of any claim predicated on denial of the First Religious Name Change Request.  Moreover, as recently as October 2015, plaintiff asserted that the September 2005 Director's Decision for Appeal # HDSP-05-397 regarding his First Religious Name Change Request "approved [plaintiff's] right to utilize [his] religious name *along with* [his] commitment name."  (Ex. G 111-12) (emphasis added).  The Second Amended Complaint also expressly alleges that Appeal # HDSP-05-397 "approved Plaintiff's right to utilize his religious name *along with* his commitment name for incoming and outgoing mail."  (SAC Att. ¶ 27) (emphasis added).  Given plaintiff's apparent belief that he had been granted at least some kind of relief in connection with the First Religious Name Change Request, it cannot reasonably be inferred that defendant Runnels (or any other defendant) had *timely* notice over the last ten plus years that plaintiff still intended to pursue a claim predicated on the initial denial of the First Religious Name Change Request.  Nor is it reasonable to conclude that plaintiff's failure to pursue such a claim more promptly over that lengthy period of time was at all reasonable and/or in good faith, much less that defendant Runnels (or any other defendant) would not be significantly prejudiced by having to defend the otherwise barred claim.  See, e.g., Ervin v. County of Los Angeles, 848 F.2d 1018, 1019-20 (9th Cir. 1988) (affirming dismissal of civil rights action for failure to state a claim based on running of statute of limitations where court declined to apply equitable tolling based on finding that plaintiff's delay of "as much as a year and a half" in filing civil rights claim "was neither reasonable nor in good faith"), cert. denied, 489 U.S. 1014 (1989).  Thus, the Second Amended Complaint reflects that the applicable statute of limitations

///

1    expired long before plaintiff signed the Original Complaint in October 2014, or

2    formally filed it in December 2014.

3         Consequently, plaintiff's free exercise (and other) claims are time-barred to

4    the extent they are predicated on the alleged denial of the First Religious Name

5    Change Request.

6              **5.      Denial of Second Religious Name Change Request**

7         Like the First Amended Complaint, the Second Amended Complaint fails to

8    state a viable free exercise claim against any defendant predicated on the denial of

9    the Second Religious Name Change Request and/or related alleged misconduct.

10        Here, plaintiff does not plausibly allege that any specific defendant caused a

11   constitutional violation by personally participating in the activities about which

12   plaintiff complains in the Second Religious Name Change Request or in the denial

13   of such request, or that any defendant specifically directed unspecified

14   "subordinates" to take such action.  Plaintiff's conclusory allegations that

15   "[d]efendant Soto was grossly negligent in supervising subordinates who

16   committed the wrongful acts of returning [] Plaintiff's legal mail to the Court

17   without Notification of Disapproval . . ." (SAC Att. ¶ 25) or that unspecified

18   defendants and/or other CSP-LAC officials violated multiple constitutional rights

19   by "refus[ing] to deliver plaintiff's legal and personal mail addressed to him in his

20   Sacred name . . ." (SAC Att. ¶ 35) do not demonstrate a causal link between any

21   *individual* defendant's misconduct and a specific alleged constitutional violation,

22   and therefore are insufficient to state a viable Section 1983 claim against any of the

23   defendants.  See generally Baker v. McCollan, 443 U.S. 137, 142 (1979) ("[A]

24   public official is liable under [Section] 1983 only 'if he *causes* the plaintiff to be

25   subjected to a deprivation of his constitutional rights.'") (citation omitted;

26   emphasis in original); Jones v. Williams, 297 F.3d at 934 ("In order for a person

27   acting under color of state law to be liable under section 1983 there must be a

28   showing of personal participation in the alleged rights deprivation[.]"); Taylor, 880

1   F.2d at 1045 ("Liability under section 1983 arises only upon a showing of personal

2   participation by the defendant.").

3       Similarly, plaintiff does not plausibly allege that a specific defendant caused

4   a constitutional deprivation based on allegations that certain items of mail sent

5   from the Court to plaintiff (*i.e.*, "first envelope" and "second envelope")

6   (collectively, "Returned Mail") were erroneously returned.  (SAC Att. ¶ 25; Ex. G

7   at 102, 105-08).  Inmates generally have a First Amendment right to send and

8   receive mail using a religious name "in conjunction with [the inmate's] committed

9   name. . . ."  Malik v. Brown, 71 F.3d 724, 729-30 (9th Cir. 1995) (citations

10  omitted); see also Prison Legal News v. Lehman, 397 F.3d 692, 699 (9th Cir.

11  2005) (inmates have First Amendment right to receive mail subject to "substantial

12  limitations and restrictions in order to allow prison officials to achieve legitimate

13  correctional goals and maintain institutional security") (citations and internal

14  quotation marks omitted).  In addition, CDCR regulations require all "incoming"

15  inmate mail to be "properly addressed" – that is, "addressed to an individual

16  inmate, showing their [sic] name, CDCR number and the address for the applicable

17  institution."  Cal. Code Regs. tit. 15, § 3133(b)(1).

18      Here, the Second Amended Complaint does not plausibly allege that plaintiff

19  was deprived of his First Amendment right to receive mail addressed to his

20  religious name *in conjunction with* his commitment name.  Although plaintiff was

21  informed, in part by the September 2005 Director's Decision, that he was permitted

22  to use his religious name along with his commitment name "for incoming,

23  outgoing and confidential correspondence," plaintiff was concurrently told that his

24  commitment name (*i.e.*, "the name reflected on [plaintiff's] Abstract of Judgment")

25  would "remain . . . and [] continue to be used on all [CDCR] records" – which

26  necessarily included the record of plaintiff's CDCR identification number.  (SAC

27

28

1   Att. ¶¶ 24, 27; Exs. F at 98, H at 114); see CDCR Operations Manual[8] § 73010.6.1

2   (Identifying Data) (defining inmate "Commitment Name" as the name "reflected

3   on the original Abstract of Judgment . . . by which the inmate was delivered to

4   [CDCR] custody").  Accordingly, since it appears that the Returned Mail was

5   addressed to plaintiff's *religious* name only (Ex. G at 105-08), the CDCR

6   identification number used on the envelope (which was linked in CDCR records

7   only to plaintiff's *commitment* name) necessarily did not match the named

8   addressee and, consequently, the Returned Mail was not "addressed to an

9   individual inmate" of record.  To the extent the Second Amended Complaint

10  suggests that the CSP-LAC mail room should, nonetheless, have accepted and

11  delivered the Returned Mail to plaintiff based solely on plaintiff's religious name

12  and/or the mismatched CDCR identification number, plaintiff fails to state a viable

13  constitutional violation.  Cf., e.g., Malik, 71 F.3d at 727, 729-30 (although inmate

14  has First Amendment interest in using his religious name in conjunction with his

15  commitment name, "an inmate cannot compel a prison to reorganize its filing

16  system to reflect the new name") (citations omitted).

17      Consequently, the Second Amended Complaint fails to state a viable free

18  exercise claim on this basis.

19              **6.    Denial of Third Religious Name Change Request**

20      Like the First Amended Complaint, the Second Amended Complaint fails to

21  state a viable free exercise claim against any defendant predicated on the denial of

22  the Third Religious Name Change Request and related alleged misconduct.

23      In short, plaintiff does not plausibly allege that the actions of defendants

24  Romero and Drayton (or any other defendants) related to the Third Religious Name

25  _____

26      [8]See California Department of Corrections and Rehabilitation Operations Manual,
    available at https://www.google.com/url?q=http://www.cdcr.ca.gov/Regulations/
27  Adult_Operations/docs/dom/dom%25202015/DOM%25202015.pdf&sa=U&ved=0ahUKEwikx
    M6vg5zPAhXHLmMKHTWhCoMQFggEMAA&client=internal-uds-cse&usg=AFQjCNHGWv
28  OtISfac3M-9ivIkAOMfTuxVw.

Change Request placed a substantial burden on plaintiff's exercise of a sincerely-held religious practice.  For example, plaintiff does not plausibly allege that his *religion* specifically required plaintiff to use his religious name on his door sign, or that the failure to permit plaintiff to do so forced plaintiff to forego any sincerely held religious beliefs or to engage in conduct that violated those beliefs.  At most the Second Amended Complaint alleges that plaintiff's religious name needed to be on his door sign to "ensure the delivery of plaintiff's incoming mail" (SAC Att. ¶ 27) – which is insufficient to show a burden on any *religious* practice at all.  Moreover, such conclusory allegation is directly contradicted by the November 5, 2015 screening memo rejecting the Third Religious Name Change Request which stated, among other things "[t]he name placed above [plaintiff's] door has nothing to do with incoming and outgoin[g] correspondence."  (Ex. H at 115) (emphasis omitted).

Allegations that defendants Romero and Drayton "went rogue" by disregarding the September 2005 Director's Decision which permitted plaintiff to use both his religious and committed name/CDC inmate number *on correspondence*, do not plausibly show that defendants Romero and Drayton violated plaintiff's First Amendment free exercise rights when they allegedly directed that the *sign* on plaintiff's door be changed.

Consequently, the Second Amended Complaint fails to state a viable free exercise claim on this basis.

**D.    The Second Amended Complaint Fails to State a Viable First Amendment Freedom of Expression/Association Claim Against Any Defendant**

The Second Amended Complaint does not state a viable free expression and/or association violation against any defendant.  Preliminarily, the Second Amended Complaint does not reasonably appear to assert any claim for violation of such First Amendment rights predicated on the denial plaintiff's requests for a

Jewish kosher diet and/or Ritual Herbal Smoke Blends.  (<u>See</u> SAC Att. ¶¶ 9, 11, 16, 19, 28-31).  Accordingly, in this section the Court addresses plaintiff's free expression and/or association claims only with respect to allegations that plaintiff was denied separate religious services and a religious name change.

The Second Amended Complaint fails to state a viable free expression and/or association claim against any defendant predicated on the alleged denial of the Second and Third Religious Name Change Requests and alleged misconduct contained therein.  As noted above, plaintiff allegedly was already permitted to send and receive correspondence using his religious name in conjunction with his commitment name.  (SAC Att. ¶ 27; Ex. F at 98).  In addition, plaintiff does not plausibly allege that his inability to have a sign of his choosing on the door to his cell infringed any verbal or written communication and/or expressive conduct, and/or prevented plaintiff from assembling in any particular manner protected by the First Amendment.  To the extent plaintiff is attempting to allege a First Amendment violation on non-religious grounds (<u>e.g.</u>, because he was not permitted to use a name other than his commitment name), the Second Amended Complaint fails to state a viable Section 1983 claim.  <u>Cf., e.g.</u>, <u>Kirwan v. Larned Mental Health</u>, 816 F. Supp. 672, 674 (D. Kan. 1993) (finding no free exercise or other First Amendment violation where plaintiff had "changed his name for personal reasons").

Plaintiff also has not stated a viable First Amendment free expression and/or association claim predicated on denial of his requests for religious services.  In short, the Second Amended Complaint does not plausibly allege that denial of the religious services plaintiff requested deprived plaintiff of any associational right beyond that which he had already surrendered at the prison gates.  <u>See generally</u> <u>Overton</u>, 539 U.S. at 131 (noting that "freedom of association is among the rights least compatible with incarceration") (citations omitted).  Moreover, as discussed above, to the extent the Second Amended Complaint alleges that plaintiff's

proposed separate religious services would generally be beneficial to the inmate population as a whole (SAC Att. ¶ 12; Ex. B at 32-33), plaintiff does not state a viable claim for violation of his limited constitutional right to association.  Cf., e.g., City of Dallas v. Stanglin, 490 U.S. 19, 25 (1989) (First Amendment protects only "intimate association" and "expressive association" and does not recognize "generalized right of 'social association'").

Consequently, the Second Amended Complaint fails to state a viable denial of First Amendment free expression/association claim.

**E.     The Second Amended Complaint Fails to State a Viable First Amendment Denial of Access to the Courts Claim Against Any Defendant**

The Second Amended Complaint also fails to state a viable First Amendment claim for denial of access to the courts.

In short, plaintiff fails plausibly to allege that he suffered an "actual injury" from any defendant's alleged misconduct, i.e., that defendants' actions frustrated or impeded plaintiff's attempt to bring a nonfrivolous legal claim.  See Nevada Dept. of Corrections, 648 F.3d at 1018.   Indeed, plaintiff fatally fails to identify any nonfrivolous underlying claim that was allegedly compromised by any defendant's alleged misconduct.  Harbury, 536 U.S. at 416.

Consequently, the Second Amended Complaint fails to state a viable First Amendment, denial of access to the courts claim.

**F.     The Second Amended Complaint Fails to State a Viable RLUIPA Claim Against Any Defendant**

First, plaintiff's RLUIPA claim for damages against the defendants must be dismissed because RLUIPA does not authorize suits for damages against state officials in their individual capacities.  Jones v. Williams, 791 F.3d at 1031 (citing Wood v. Yordy, 753 F.3d 899, 904 (9th Cir. 2014)).

Second, for essentially the same reasons discussed above with respect to

plaintiff's First Amendment free exercise claim, the allegations in the Second Amended Complaint otherwise are (1) time-barred (to the extent predicated on the denial of the First Religious Name Change Request in 2005); or (2) do not state a RLUIPA claim because (a) they do not plausibly show that the denial of plaintiff's requests for a kosher diet and/or ritual herbal smoke blends infringed on any sincerely-held *religious* exercise pursued by plaintiff personally, much less imposed a "substantial burden" thereon; (b) they do not plausibly show that the failure to grant plaintiff's First and Second Requests for Religious Services imposed anything more than an inconvenience to plaintiff's pursuit of any sincerely-held religious belief; and/or (3) they do not plausibly allege that any named defendant otherwise took any action or caused any action to be taken that substantially burdened plaintiff's religious exercise.

Consequently, the Second Amended Complaint fails to state a viable RLUIPA claim on any of the alleged grounds.

**G.    The Second Amended Complaint Fails to State a Viable Fourteenth Amendment Procedural Due Process Claim Against Any Defendant**

The Second Amended Complaint fails to state a viable Fourteenth Amendment procedural due process claim.  Preliminarily, the Second Amended Complaint does not plausibly allege that plaintiff's right to due process was violated in connection with the denial of plaintiff's requests for a Jewish kosher diet, Ritual Herbal Smoke Blends, specified religious services and/or, as discussed above, denial of plaintiff's grievances related thereto.  (See SAC Att. ¶¶ 9, 11, 16, 19, 28-31).  Accordingly, in this section the Court addresses plaintiff's Due Process claims only with respect to the alleged improper denial of the Second and Third Religious Name Change Requests.

Here, even assuming (but not deciding) that plaintiff had a Fourteenth Amendment due process liberty interest in receiving notice whenever incoming

1   mail addressed solely to his religious name was not delivered by prison officials,

2   no such protected interest was implicated in the instant case.  The Second

3   Amended Complaint alleges that on two occasions plaintiff's mail from the Court

4   was not delivered, but instead returned.  (SAC Att. ¶ 25; Ex. G 102, 105-08).  As

5   discussed above, the Returned Mail was apparently addressed to plaintiff's

6   *religious* name only along with plaintiff's CDCR identification number which was

7   linked in CDCR records only to plaintiff's *commitment* name.  (SAC Att. ¶ 25; Ex.

8   G 102, 105-08).  Accordingly, since the Returned Mail was not expressly

9   "addressed to . . . an inmate" name that matched CDCR records, CSP-LAC mail

10  room officials had no obligation under the Fourteenth Amendment to notify

11  plaintiff or provide any other procedural protections before rejecting the Returned

12  Mail as improperly addressed.

13          In addition, the Second Amended Complaint does not plausibly allege that

14  plaintiff had any protected interest in having a door sign in the first instance, much

15  less one with a particular name on it.  Absent any such protected interest, CSP-

16  LAC officials had no duty under the Fourteenth Amendment to provide even

17  minimum procedural safeguards before removing or changing the sign on

18  plaintiff's door.  Plaintiff's conclusory speculation that prison officials would be

19  unable to deliver his incoming mail without plaintiff's "religious name" listed on

20  his door sign is insufficient to state a viable Section 1983 claim.

21          Consequently, the Second Amended Complaint fails to state a viable due

22  process claim on the grounds plaintiff alleged.

23      **H.     The Second Amended Complaint Fails to State a Viable**

24              **Fourteenth Amendment Equal Protection Claim Against Any**

25              **Defendant**

26          The Second Amended Complaint does not plausibly allege that any

27  defendant discriminated against plaintiff "based upon" plaintiff's religion.  See

28  Thornton, 425 F.3d at 1166 (to state viable Section 1983 claim for violation of

1   Equal Protection Clause plaintiff must allege that defendant "acted with an intent

2   or purpose to discriminate against the plaintiff based upon membership in a

3   protected class[]") (citations omitted).  In addition, plaintiff does not allege

4   membership in any other protected class that could form the basis of an equal

5   protection claim.  Cf., e.g., Rodriguez v. Cook, 169 F.3d 1176, 1179 (9th Cir.

6   1999) (prisoners not "suspect class" for purposes of equal protection analysis)

7   (citations omitted); Larson v. Runnels, 2008 WL 220377, *4 (E.D. Cal. Jan. 25,

8   2008) ("There are no cases which hold that the right to use tobacco is a

9   fundamental liberty interest or that a prisoner who uses tobacco products is a

10  member of a protected class."), reconsideration denied, 2008 WL 474316 (E.D.

11  Cal. Feb. 14, 2008).  In addition, the Second Amended Complaint does not

12  plausibly allege that any particular defendant intentionally treated plaintiff

13  differently from others similarly situated.

14      Consequently, the Second Amended Complaint fails to state a viable equal

15  protection claim.

16  **V.    THE SECOND AMENDED COMPLAINT IS DISMISSED WITHOUT**

17  **LEAVE TO AMEND**

18      The Second Amended Complaint, in substance, is practically the same as

19  plaintiff's First Amended Complaint, despite plaintiff's assertion of multiple new

20  legal theories, and identification of three additional defendants (who were, directly

21  or indirectly, referenced in one or both of plaintiff's prior complaints).  In addition,

22  plaintiff has had a total of three opportunities to draft a complaint, yet has either

23  been unable or unwilling to state a viable claim for relief based on essentially the

24  same *factual* allegations involving essentially the same individuals.  Thus, the

25  Court finds that any further amendment would be futile.  See generally, Knapp,

26  738 F.3d at 1109 ("When a litigant knowingly and repeatedly refuses to conform

27  his pleadings to the requirements of the Federal Rules, it is reasonable to conclude

28  that the litigant simply *cannot* state a claim.") (emphasis in original).

1    ///

2           Accordingly, dismissal is without further leave to amend.  See Cafasso, 637

3    F.3d at 1058 (district courts enjoy "particularly broad" discretion to deny leave to

4    amend where plaintiff previously amended complaint).

5    **VI.    ORDER**

6           IT IS THEREFORE ORDERED that the Second Amended Complaint is

7    dismissed without further leave to amend based upon plaintiff's failure to state a

8    claim.  The Clerk is directed to enter judgment accordingly.

9    DATED: 12/13/16

_____

HONORABLE GEORGE H. KING
UNITED STATES DISTRICT JUDGE